REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No.  2294

September Term, 2012

STATE OF MARYLAND

v.

GEORGE CAMERON SEWARD

Krauser, C.J.,
*Matricciani,
Moylan, Charles E., Jr.
          (Retired, Specially Assigned),

JJ.

Opinion by Krauser, C.J.

Filed: October 28, 2014

*Albert J. Matricciani, Jr., J., participated in
the hearing of this case but retired prior to the
adoption and issuance of this opinion.

In *Douglas v. State*, 423 Md. 156 (2011), the Court of Appeals recognized a right of appeal, from the "denial" of a petition for writ of actual innocence, by the petitioner. But it left open the question of whether the State has a corresponding and comparable right of appeal from the "grant" of such a petition. That issue is now before us in this appeal.

George Cameron Seward, appellee, was convicted, after a bench trial in the Circuit Court for Baltimore County, of first-degree rape, first-degree sexual offense, assault with intent to murder, and related lesser offenses. He thereafter noted an appeal, whereupon this Court affirmed his judgments of conviction.

Eleven years later he filed a petition for postconviction relief. When that petition was denied, no further action was taken for more than another decade. Then, when more than twenty-five years[1] had passed since he was convicted of the aforementioned crimes, he filed a petition for a writ of actual innocence. His petition was granted, and the circuit court ordered that Seward be given a new trial.

When the State appealed that decision, Seward responded with a motion to dismiss, challenging the State's right to appeal from the "grant" of an actual innocence petition. Although we initially denied this motion, we granted Seward leave to renew it in his appellate brief, which he has done.

For the reasons that follow, we shall deny Seward's motion to dismiss once again, as we conclude that the State has a right to appeal from a decision granting a petition for writ of

---

[1]In 1985, Seward was convicted; in 1986, his direct appeal was decided; in 1997, he filed a postconviction petition, which was denied two years later, in 1999; and, in 2010, he filed the petition for writ of actual innocence which resulted in this appeal.

actual innocence. Furthermore, because the court below applied the wrong standard of review, in granting Seward's petition, and because the record clearly shows that Seward failed to act with due diligence in pursuing his actual innocence claim, as the correct standard requires, we shall vacate the circuit court's order and remand this case with instructions to reinstate Seward's convictions.

**Facts**

In the early afternoon of July 26, 1984, Phyllis D. was raped and robbed in her Baltimore County home and then shot in the face by her attacker, while her newborn baby lay in a crib in an adjoining room. Her assailant then stole her car and fled.

When Seward was arrested several months later, by Baltimore County police, for an unrelated offense, an officer at the police precinct noticed that Seward resembled a composite drawing that had been made of Ms. D.'s assailant. A photographic array, which included Seward's photograph, was then prepared and presented to Ms. D. From that array, Ms. D. identified Seward as the man who raped, robbed, and shot her and then two months later, re-identified Seward in a line-up arranged by the police.

Seward was thereafter charged, in a fourteen-count indictment, with first-degree rape, first-degree sexual offense, assault with intent to murder, breaking and entering a dwelling house, use of a handgun in the commission of a felony, robbery with a dangerous and deadly

2

weapon, and other related offenses.[2]  At his bench trial, in March 1985, a number of witnesses testified for both the State and the defense, but only two of those witnesses are relevant to Seward's present claim of actual innocence:  Phyllis D., the victim; and Louise Stamathis, the owner of a dog grooming shop where Seward worked.

Ms. D. testified that she was at home at approximately 12:20 p.m. on July 26, 1984, watching television.  At that time, she was on maternity leave from her job, having just given birth to her son, a few weeks earlier.  Upon hearing a knock, she opened the front door of her home.  Standing there was a "black man."  He claimed that his car had broken down nearby and asked her permission to use her telephone.  After gaining entry and seemingly using her phone, the man requested to use her bathroom.  Inside the bathroom, he apparently put on gloves, because, upon leaving the bathroom, he, wearing gloves, grabbed her.  Then, pointing a handgun at her, he raped her and forced her to fellate him.

After repeatedly sexually assaulting Ms. D., he demanded her money and jewelry. And, then, taking the keys to Ms. D.'s car, he left.  As he departed, he turned and shot Ms. D. in the face.  Ultimately, police were summoned to Ms. D.'s home by a neighbor, who had heard her ensuing cries for help.

---

[2]Seward was also charged with:  second-, third-, and fourth-degree sexual offense; common law assault; breaking a dwelling house in the daytime with the intent to commit a felony; common law robbery; and two counts of theft.

At trial, Ms. D. identified Seward as her assailant and confirmed that she had previously identified him from a photographic array, several weeks after the assault, and two months after that had picked him out of a line-up.

Seward responded, after the State concluded its case, by calling to the stand, as part of his "mistaken-identity" defense, his employer, Louise Stamathis. She testified that Seward was working for her at the time of the rape, robbery, and shooting in question, but she could not recall whether he had worked at her dog grooming shop on the day those crimes were committed, that is, July 26, 1984. She further stated that, as she was now required to provide her husband, who was suffering from multiple illnesses,[3] with around-the-clock care, she was unable to locate her payroll records and unable to verify whether Seward had worked in her shop during the commission of these dreadful crimes. At the conclusion of her testimony, the court instructed her to "[p]lease try to get those records and get in communication because [she was] still under summons to the Court." But more than a decade passed before she was ever heard from again.

At his trial, which began eight months after the assault, Seward had a goatee and a mustache. Although Ms. Stamathis testified that he "always" had such facial hair, Ms. D. had not noticed, at the time of the attack, whether her assailant had a goatee and was uncertain whether he had a mustache. Relying on this purported, and possibly manufactured

---

[3]At the time of Seward's trial, Mr. Stamathis suffered from both amyotrophic lateral sclerosis (commonly known as ALS or "Lou Gehrig's disease") and Alzheimer's disease.

4

discrepancy (given the eight months that had elapsed between the crimes and Seward's trial), as well as the inconclusiveness of the forensic evidence gathered by police,[4] Seward claimed that this whole matter was a case of mistaken identity.

At the conclusion of the trial, the court observed that Ms. D. "had some twenty to thirty minutes, in broad daylight hours," to observe the assailant and that she "was in close proximity to him, face to face," throughout that time. Taking into consideration the opportunity that Ms. D. had to fully and at length observe her attacker as well as the testimony of police detectives that, when she identified Seward from a photographic array and then picked him out of a line-up, she did so "immediate[ly] and positive[ly]" and "without equivocation or reserve," the court opined that Ms. D. was "absolutely and unequivocally certain that" Seward was the man who "raped her, robbed her, and shot her." Accordingly, the court found Seward guilty of all charges.

A motion for new trial followed, which "hinged on the contention that [the trial judge] had relied upon an unreliable identification." *Seward v. State*, No. 1337, Sept. Term 1985, at 3 (filed May 28, 1986) (per curiam), *cert. denied*, 307 Md. 406 (1986). That motion was denied, and Seward was sentenced to consecutive terms of life imprisonment for both

---

[4]Police technicians recovered latent fingerprints, vacuum, and hair samples from the crime scene as well as from Ms. D.'s car (which had been stolen by the rapist), and a vaginal swab was also taken from her. None of the physical evidence, however, was ever linked to Seward through forensic testing. It should be borne in mind, however, that forensic testing did not include DNA sequencing or analysis, which was then merely in the research-and-development stage and did not become available to police crime laboratories until years later.

first-degree rape and first-degree sexual offense; as well as additional sentences of thirty years for assault with intent to murder; three years for breaking and entering a dwelling house; twenty years for use of a handgun in the commission of a felony; and twenty years for robbery with a dangerous and deadly weapon, all of which were to run consecutively to the first life sentence.[5] His convictions were later affirmed by this Court in an unreported opinion, *Seward v. State*, No. 1337, Sept. Term 1985, and the mandate of this Court was received and filed in the circuit court on July 1, 1986.

Eleven years later, in 1997, Seward filed a petition for postconviction relief in the Baltimore County circuit court, alleging ineffective assistance of counsel. He claimed that his trial counsel had "failed to present available evidence," namely, Ms. Stamathis's payroll records, "or to conduct reasonable investigation to uncover" such evidence, which, he maintained, "would have tended to exculpate" him. At the hearing held on that petition, Ms. Stamathis produced the handwritten payroll records that she had been unable to find during Seward's 1985 trial and testified that, based upon those records, Seward, on the day of the crimes, had been working at her shop, which was approximately two miles from the crime scene, and that it would have been "[i]mpossible" for him to have left her shop during the relevant time period. She further testified that, if she had been issued a court order, at the time of Seward's trial, to search her records, she would "had to have done it" and that, if she had

---

[5]The remaining convictions were merged.

located her payroll records at that time, she "would have been willing" to offer the same exculpatory testimony then as she was presently giving at Seward's postconviction hearing.

The circuit court denied Seward's postconviction petition, finding that Seward's trial counsel had "acted reasonably in investigating Ms. Stamathis as an alibi witness and calling her as a defense witness at trial" and that "[h]er failure to comply with the State's, defense counsel's, and the Court's request for records in no way constitute[d] ineffective assistance" of counsel. Seward's subsequent application for leave to appeal from that decision was denied by this Court. Then, in 2008, Seward sought to have any remaining evidence from his 1985 rape case subjected to DNA analysis, but that evidence was no longer available.

Two years later and a total of twenty-five years after his trial, Seward, in 2010, filed a petition for a writ of actual innocence in the Circuit Court for Baltimore County. In that petition, he alleged that Ms. Stamathis's employment records, which he claimed constituted newly discovered evidence, showed that he had worked at her dog grooming shop on the day of the crimes and that, had this evidence been available and been presented at trial, "there is a substantial possibility that the result of the trial may have been different," and thus he claimed that he was entitled to a new trial. The circuit court granted Seward's petition and ordered a new trial, whereupon the State filed a motion for reconsideration, a notice of appeal, and a motion to stay proceedings in the circuit court pending the outcome of that appeal. The circuit court denied both of the State's motions and scheduled the case for a new trial.

7

Seward thereafter filed a motion in this Court to dismiss the appeal, contending that it was not authorized by law. We denied that motion "with leave to seek that relief in" his brief, which he has, and further ordered that proceedings in the circuit court be stayed pending a resolution of the State's appeal.

## Motion to Dismiss

In his motion to dismiss this appeal, Seward claims that the State has no right of appeal from the "grant" of a petition for writ of actual innocence by the circuit court, because Criminal Procedure Article, § 8-301 ("CP"), does not expressly provide the State with such a right. Nor is such a right implied, he reasons, given that the State's right to appeal in criminal cases is limited to only those grounds provided by statute. He further contends that *Douglas v. State*, *supra*, 423 Md. 156, which recently established a right of appeal from the "denial" of a petition for writ of actual innocence, does not apply here, because the "grant" of an actual innocence petition, unlike its denial, does not constitute a final judgment, but, only, the award of a new trial.

As for Seward's assertion that the State's right to appeal in criminal cases is limited to only those grounds expressly provided by statute and that there is no such statutory provision applicable here, the State replies that a writ of actual innocence proceeding is "not a part of [a] criminal case" but, rather, is a "separate, civil and collateral proceeding," akin to a postconviction or coram nobis inquiry and that, therefore, the strict limitations on the State's right to a criminal appeal, in Courts and Judicial Procedures Article, § 12-302(c) ("CJ"), do

8

not apply here. Then, turning to Seward's assertion that the "grant" of an actual innocence petition is not a final judgment, the State responds that the grant of such a petition (at least under the circumstances here), like its denial, is, in fact, a final judgment, as it results in setting aside the final judgment of a criminal case. And, because the circuit court's grant of Seward's petition is a final judgment in what the State maintains is a civil, collateral action, it is appealable, the State asserts, under CJ § 12-301, which, with exceptions not relevant here, permits any party aggrieved by a circuit court judgment, in a civil action, to appeal that judgment.

We begin our consideration of Seward's motion to dismiss with the observation that the actual innocence statute, CP § 8-301, unlike either the Maryland Uniform Postconviction Procedure Act, CP §§ 7-101 to 7-301, or the statute governing postconviction petitions for DNA testing, CP § 8-201, is silent as to whether an appeal may be taken, by either side, from an order of a circuit court disposing of a petition filed pursuant to it. *Compare* CP § 8-301 (absence of appeal provision)[6] *with* CP § 7-109(a) (stating that a person aggrieved by an order

---

[6] The actual innocence statute (§ 8-301 of the Criminal Procedure Article) provides:

> (a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
>     (1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and

(continued...)

9

(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

(b) A petition filed under this section shall:

(1) be in writing;

(2) state in detail the grounds on which the petition is based;

(3) describe the newly discovered evidence;

(4) contain or be accompanied by a request for hearing if a hearing is sought; and

(5) distinguish the newly discovered evidence claimed in the petition from any claims made in prior petitions.

(c)    (1) A petitioner shall notify the State in writing of the filing of a petition under this section.

(2) The State may file a response to the petition within 90 days after receipt of the notice required under this subsection or within the period of time that the court orders.

(d)    (1) Before a hearing is held on a petition filed under this section, the victim or victim's representative shall be notified of the hearing as provided under § 11-104 or § 11-503 of this article.

(2) A victim or victim's representative has the right to attend a hearing on a petition filed under this section as provided under § 11-102 of this article.

(e)    (1) Except as provided in paragraph (2) of this subsection, the court shall hold a hearing on a petition filed under this section if the petition satisfies the requirements of subsection (b) of this section and a hearing was requested.

(2) The court may dismiss a petition without a hearing if the court finds that the petition fails to assert grounds on which relief may be granted.

(continued...)

10

disposing of a postconviction proceeding, "including the Attorney General and a State's Attorney," may file an application for leave to appeal) *and* CP § 8-201(k)(6) (providing that appeal to the Court of Appeals "may be taken from an order entered under" the DNA postconviction statute).

Nonetheless, in *Douglas v. State*, *supra*, 423 Md. 156, the Court of Appeals declared that neither the absence of an appeal provision in the actual innocence statute, nor the action taken by the General Assembly in adding and then deleting language from the actual innocence statute (CP § 8-301) that would have granted a right of appeal,[7] bars an appeal by a petitioner from the denial of his or her actual innocence petition. In explaining why it believed that the General Assembly ultimately redacted the provision granting such a right,

---

[6](...continued)

> (f) (1) In ruling on a petition filed under this section, the court may set aside the verdict, resentence, grant a new trial, or correct the sentence, as the court considers appropriate.
>
> (2) The court shall state the reasons for its ruling on the record.
>
> (g) A petitioner in a proceeding under this section has the burden of proof.

Md. Code (2002, 2008 Repl. Vol., 2010 Supp.), CP § 8-301.

[7]The third reading of 2010 House Bill 128 provided, in proposed CP § 8-301(h)(1): "Within 30 days after the court passes an order in accordance with this section, the State or the petitioner may appeal the order to the Court of Special Appeals." This language was subsequently stricken when the bill was considered by the Senate Judicial Proceedings Committee, and the bill as ultimately enacted did not include an appeal provision. *Compare* 2010 House Bill 128, Third Reading *with* 2010 House Bill 128, Enrolled Bill (available at http://mgaleg.maryland.gov/webmga/frmMain.aspx?tab=subject3&ys=2010rs/billfile/hb0 128.htm) (last visited Oct. 10, 2014). *See also* 2010 Md. Laws, ch. 234, § 1, at 1606.

11

the Court opined that such a provision would have been "redundant and thus unnecessary," given that the final judgment provision of CJ § 12-301[8] already grants such a right of appeal. *Id.* at 173. In other words, the General Assembly intended that the actual innocence statute, CP § 8-301, which does not expressly grant a right of appeal, be read in concert with CJ § 12-301, which does, and thus there was no reason to place a right of appeal in the actual innocence statute when that right already existed in CJ § 12-301.

Because the Court of Appeals believed that, in recognizing a right of appeal from the denial of an actual innocence petition, it was, in effect, implementing the intent of the General Assembly, we now turn to the legislative history of the actual innocence statute to determine the scope of that right as envisioned by that legislative body. In so doing, we find that the 2010 House Bill 128, which included the deleted "right of appeal" amendment, would have

---

[8]CJ § 12-301 provides as follows:

> Except as provided in § 12-302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

Md. Code (1974, 2012 Repl. Vol.), CJ § 12-301.

created a bilateral right of appeal from "an order [passed] in accordance with this section."

*See* 2010 House Bill 128, Third Reading.[9]

Because the Court of Appeals, in *Douglas*, was simply implementing what it deemed to be the intent of the General Assembly (and presumably not just half of that intent), we are impelled to conclude that a right of appeal, from a decision on an actual innocence petition, must be a bilateral right of appeal. To conclude otherwise would, under the Court of Appeals' reasoning, in effect, thwart the intent of that legislative body, a legally indefensible result. We therefore hold that the State has the same right of appeal from the grant of a petition for a writ of actual innocence that a petitioner has from the denial of such a petition. And, as indicated, any other conclusion would, we believe, run afoul of the General Assembly's intent, an intent implemented by our highest court, in *Douglas*.

That the General Assembly intended that any right of appeal from the disposition of an actual innocence petition be a bilateral right leads inexorably to the conclusion that that legislative body viewed an actual innocence proceeding as a collateral civil action, separate from the underlying criminal case. Otherwise, clearly, it would not have considered granting a bilateral right of appeal, as the State is, with few exceptions, barred by the Double Jeopardy Clause from exercising such a right in a criminal case. And, consistent with that conclusion, we note that the actual innocence statute, CP § 8-301, was placed in Title 8 of the Criminal

---

[9]The bill file for 2010 House Bill 128 is available at http://mgaleg.maryland.gov/webmga/frmMain.aspx?tab=subject3&ys=2010rs/billfile/hb0 128.htm (last visited Oct. 10, 2014).

13

Procedure Article, which is now designated as "Other Postconviction Review." 2012 Md. Laws, ch. 437, § 1, at 2947-48. That is significant because if an actual innocence proceeding were a part of the underlying criminal case, then, presumably, the actual innocence statute would have been placed in Title 6 of the Criminal Procedure Article, "Trial and Sentencing."

Moreover, the legislative history of the actual innocence statute, CP § 8-301, suggests that the statute was promoted, by its sponsors, as a means to extend the relief afforded under the Uniform Postconviction Procedure Act and the DNA postconviction statute—both of which authorize actions which are of a collateral and civil nature—to postconviction claims of factual innocence, where DNA evidence is not available or relevant.[10]

---

[10]The year before enactment of the actual innocence statute, the General Assembly enacted legislation that, among other things, provided for collection of DNA samples from arrestees, as well as for various amendments to the DNA postconviction statute, CP § 8-201. 2008 Md. Laws, ch. 337 (enacting 2008 SB 211). An amendment to that legislation was adopted, providing that

> the Office of the Public Defender and the Governor's Office of Crime Control and Prevention jointly shall submit a report to the House Judiciary Committee and Senate Judicial Proceedings Committee on barriers to postconviction review of claims of factual innocence, and in particular, those based on DNA evidence.

*Id.*, section 3, at 3254.

The following January, that joint report was submitted to the legislative committees and led to the enactment, that year, of the actual innocence statute. 2009 Md. Laws, ch. 744 (enacting 2009 SB 486). Although the Office of the Public Defender ("OPD") and the Governor's Office of Crime Control and Prevention were, as reflected in that report, unable to agree on recommendations to the legislature, it is significant that the OPD, which

(continued...)

14

Furthermore, we have no reason to suspect that the General Assembly intended to categorize actual innocence proceedings as criminal actions, when its legislative siblings—the DNA and postconviction acts—were deemed, by the Court of Appeals, to be of a collateral and civil nature. *See Md. State Bar Ass'n, Inc. v. Kerr*, 272 Md. 687, 689-90 (1974) (observing that a postconviction proceeding is "an independent and collateral civil inquiry into the validity of the conviction and sentence," not "a part of the original criminal cause"); *Blake v. State*, 395 Md. 213, 234 (2006) (noting that proceeding under DNA postconviction statute is a "collateral attack on a criminal conviction"); *Trimble v. State*, 157 Md. App. 73, 78 (2004) (stating that proceeding under DNA postconviction statute is "not part of the criminal proceeding itself" and is "in fact considered to be civil in nature") (quoting *Pennsylvania v.*

---

[10](...continued)
recommended passage of the then-proposed actual innocence statute, stated, in Section III (A) of the joint report ("Barriers: Office of the Public Defender Litigation Experience—Innocence Claims Without DNA Evidence"), that the "most significant barrier to **postconviction** review of a claim of innocence is the simple fact that the appellate courts of Maryland have excluded claims of innocence as a justiciable issue." "*REPORT: Barriers to Postconviction Review of Claims of Factual Innocence, and in Particular, Those Based on DNA Evidence*," at 7 (Jan. 15, 2009) (available at Md. Dep't Legis. Servs., bill files for 2008 SB 211 and 2009 SB 486) (emphasis added). The OPD later asserted, in Section III(B) of that same joint report ("Innocence Claims Based on Newly Discovered DNA Evidence"), that the DNA postconviction statute, CP § 8-201, "has rarely benefited defendants in practice due to a number of factors," including the fact that DNA evidence is either not preserved or has been destroyed. *Id.* at 9.

In sum, the legislative materials suggest that the actual innocence statute was conceived, by its proponents, as a means to extend the relief afforded under the DNA postconviction statute to those for whom DNA evidence was unavailable.

15

*Finley*, 481 U.S. 551, 557 (1987)).  Consequently, because CJ § 12-302(c) does not apply to

civil actions, it does not bar the State's appeal in this case.

Finally, we reject Seward's contention that the grant of his actual innocence petition

is not a final judgment, because the State may re-try him.  As the Court of Appeals explained

in *Ruby v. State*, 353 Md. 100 (1999):

> A collateral challenge, by its very nature, is a separate and distinct civil procedure by which a defendant may challenge his or her conviction, sentence, or imprisonment.  Because collateral challenges are separate from the underlying judgment, the filing of such an action typically initiates an entirely new action in which the defendant sets forth his or her claims.  If the defendant prevails in the civil court where he or she sought collateral relief, that court then issues the writ directing the criminal court pursuant to the terms of the writ.

*Id.* at 107 (citation omitted).

Consistent with the foregoing description of a "collateral challenge," if an actual

innocence petitioner prevails in a proceeding under CP § 8-301, the circuit court "then issues

the writ [of actual innocence] directing the criminal court pursuant to the terms of the writ,"

*Ruby*, 353 Md. at 107, directions which, in an action under the actual innocence statute,

CP § 8-301, may take one of four possible forms:  "the court may set aside the verdict,

resentence, grant a new trial, or correct the sentence, as the court considers appropriate."

CP § 8-301(f)(1).

Because an action brought under CP § 8-301 is a collateral, civil proceeding, distinct

from the underlying criminal trial, it follows that a circuit court's order, granting a petition

16

brought under that statute and ordering relief as authorized in CP § 8-301(f)(1), is a final order from which an appeal "is authorized by the broad language of the general appeals statute," CJ § 12-301. *Skok v. State*, 361 Md. 52, 65 (2000). We therefore deny Seward's motion to dismiss and proceed to the merits of the State's appeal.

## Merits of Appeal

The substance of this appeal is the State's contention that the writ of actual innocence court erred, both in ruling that Seward's trial counsel had acted with due diligence in discovering the purported "newly discovered evidence" at issue and in finding that that evidence, as required by the actual innocence statute, CP § 8-301, created "a substantial or significant possibility that the result" of his trial might "have been different." Because we conclude that the court below erred in finding due diligence, where none existed, and, because due diligence is a threshold requirement for entitlement to a writ of actual innocence, we shall reverse on that basis without addressing the State's alternative contention, that the purported "newly discovered evidence" adduced by Seward did not create "a substantial or significant possibility that the result may have been different."

We begin our analysis of the due diligence issue by considering whether the actual innocence court, in declaring itself "bound" by the postconviction court's findings of fact and conclusions of law as the "law of the case," erred as a matter of law. We believe it did. And that unfortunate holding led the actual innocence court to feel compelled to conclude that Seward's trial counsel had acted with due diligence, despite his failure to procure the payroll

17

records of Seward's erstwhile employer, Ms. Stamathis, records whose belated recovery provided the grounds for his petition.

Under the "law of the case" doctrine, "once an appellate court rules upon a question presented on appeal, litigants and lower courts become bound by the ruling," as the "law of the case." *Scott v. State*, 379 Md. 170, 183 (2004). But the "law of the case" doctrine does not require the circuit court to bind itself to findings of fact made and conclusions of law set forth by another judge of the same court, in a collateral proceeding, *id.* at 184-85, particularly where, as here, there is a substantial difference in the standard of performance required of defense counsel in the context of a claim of ineffective assistance of counsel at a postconviction proceeding and the standard of performance demanded of trial counsel in presenting a claim of newly discovered evidence at an actual innocence proceeding. As we shall see, the court below, that is, the writ of actual innocence court, wrongly accepted as the "law of the case" an earlier finding made by the postconviction court, that Seward's counsel had not rendered ineffective assistance of counsel, a finding which, as we noted, was made under an entirely different standard of attorney performance.

In a postconviction action alleging ineffective assistance of counsel, a defendant must prove two elements: first, "that counsel's performance was deficient," that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and second, "that the deficient performance prejudiced

18

the defense," that is, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In a proceeding under the actual innocence statute, CP § 8-301, a petitioner must also prove two elements, one of which is different from that required to prevail on a *Strickland* claim: First,[11] the actual innocence petitioner must show[12] that there is "newly discovered evidence" that "could not have been discovered in time to move for a new trial under Maryland Rule 4-331," *see* CP § 8-301(a)(2), a requirement known as "due diligence"; and, second, he must persuade the court that this newly discovered evidence "creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." CP § 8-301(a)(1). *See also Yorke v. State*, 315 Md. 578, 588 (1989) (holding that newly discovered evidence warrants a new trial under Rule 4-331(c) when it

---

[11]The actual innocence statute presents the elements in reverse order. Logically, a reviewing court would first determine whether the evidence at issue is newly discovered, and only if it qualifies as such would it reach the question whether it would have influenced the verdict. But, because both elements are required, a reviewing court may, in the interest of judicial economy, reject an actual innocence claim if it is clear from the record that either element cannot be satisfied, without considering the other element. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984) (observing that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one").

[12]*See* CP § 8-301(g) (petitioner has burden of proof).

19

creates a "substantial or significant possibility" that "verdict of the trier of fact would have been affected").[13]

As will become apparent, the key distinction here is between the "performance" element of a *Strickland* claim and the "due diligence" element of an actual innocence claim. To further understand "due diligence," we must look to decisional law interpreting Rule 4-331, the rule governing motions for new trial. *See Keyes v. State*, 215 Md. App. 660, 669 (2014). That rule states in part:[14]

---

[13]The second element ("prejudice" in *Strickland*, "persuasiveness" in *Yorke*) is essentially the same in both types of claim. *Compare Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") *with* CP § 8-301(a)(1); *see Bowers v. State*, 320 Md. 416, 426-27 (1990) (explaining that *Yorke* standard and *Strickland* prejudice standard are substantially the same).

[14]The current version of Rule 4-331(a) is identical to the version in effect at the time of Seward's trial and direct appeal. Rule 4-331(c) has been amended a number of times since then but, in relevant part, is substantially similar to the version then in effect. At the time of Seward's trial and direct appeal, Rule 4-331(c) provided:

> (c) **Newly Discovered Evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
>
> * * *
>
> (2) in the circuit courts, on motion filed within one year after its imposition of sentence or its receipt of a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later.

(a) **Within ten days of verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

\* \* \*

(c) **Newly Discovered Evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

> (1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief[.]

\* \* \*

In *Argyrou v. State*, 349 Md. 587 (1998), the Court of Appeals stated that paragraph (c) of that rule "provides for the grant of a new trial, or other appropriate relief, on the basis of newly discovered evidence, but only if the prescribed requirements are met." *Id.* at 600. "To qualify as 'newly discovered,'" explained the Court, the "evidence must not have been discovered, or been discoverable by the exercise of due diligence, within ten days after the jury has returned a verdict," that is, within the time limit imposed by paragraph (a) of the same rule. *Id.* at 600-01 (footnote omitted).

Then, in explaining what constitutes "due diligence," the Court stated that, "as used in Maryland Rule 4-331(c), 'due diligence' contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts

21

known to him or her." *Id.* at 605. The Court analogized the "due diligence" required of a defendant, in filing a motion for new trial, to the duty to investigate, imposed upon a civil litigant, who files an action after the statute of limitations appears to have expired, but who attempts to invoke the "discovery rule" to avoid that limitation, observing that "the statute of limitations is activated based on actual knowledge, that is, express cognition, or awareness implied from

> 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. . . . In other words, a [person] cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect.'"

*Id.* at 603 (quoting *Poffenberger v. Risser*, 290 Md. 631, 636 (1981)).[15]

In comparing the two standards, we observe that, under the *Strickland* "performance" standard, trial counsel is presumed to have rendered "reasonable professional assistance" and need not, as a general rule, pursue any particular strategy, trial tactic, or defense theory. *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 787-88 (2011); *see id.* at 789 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will

---

[15]The role played by "due diligence" in adjudicating claims of newly discovered evidence cannot be overstated. In *Love v. State*, 95 Md. App. 420, *cert. denied*, 331 Md. 480 (1993), we held that even an otherwise meritorious motion for new trial, on the ground of newly discovered evidence, was properly denied because the defendant failed to exercise due diligence in pursuing such a motion. *Id.* at 423, 434-35.

be limited to any one technique or approach.") (quoting *Strickland*, 466 U.S. at 689). In contrast, under the "due diligence" standard, there is no presumption that trial counsel has acted diligently; rather, the burden is on the petitioner to show that his counsel acted with due diligence. *Argyrou*, 349 Md. at 609. Moreover, to satisfy "due diligence," trial counsel has an affirmative obligation—to make a reasonable and good faith attempt to obtain the evidence at issue. *Id.* at 605. In short, the mere fact that trial counsel was found not to have performed deficiently under *Strickland* does not necessarily mean that he has also satisfied "due diligence" under *Argyrou*.

Turning now to the matter before us, we note that the actual innocence court found that the payroll records, provided by Seward's employer, Ms. Stamathis, created a "substantial possibility that the result of the trial would have been different," given that the "State's case was solely the testimony of a single eye-witness"; that there "was no forensic evidence bolstering the identification" or tying Seward to the rape; that the victim "did not remember her attacker having" either a mustache or a beard (though it was, according to the court below, "undisputed" that, at the time of the crimes, Seward did have both a mustache and a beard); that at least some of the latent fingerprints recovered from the crime scene were from an "unknown" person; and that "the Defense, State, and [trial] Judge recognized the importance of the employment records because all three requested that Ms. Stamathis return home and search for the records and communicate if she found them."

Although the State contends that the actual innocence court clearly erred in finding that the purported "newly discovered evidence" created a "substantial possibility that the result of the trial would have been different," we shall assume, without deciding, that the "newly discovered evidence" met this statutory requirement. That is because, as we shall explain, the purported "newly discovered evidence" failed, in any event, to satisfy the second statutory prong, namely, that it "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." CP § 8-301(a)(2).

In addressing this "due diligence" issue, the circuit court considered the findings of the postconviction court. It summarized those findings as follows:

> [Seward] urged the Post Conviction Judge to find that trial counsel was ineffective for failure to procure the employment records [from Ms. Stamathis] at trial. [The postconviction court] did not so find. In an opinion dated January 25, 1999, [the postconviction court] stated that trial counsel did everything he could to get the records to court. The witness disregarded the request of the State's Attorney and the [trial judge] to look for them and return with the employment records. The [postconviction court] found that short of a Search Warrant, which [trial] counsel could not have procured, there was no way to obtain the records. For that reason, the [postconviction court] denied the Petition for Post Conviction [relief].

The circuit court then, apparently unaware of the distinction between "due diligence" (the standard under the actual innocence statute, CP § 8-301) and "incompetence under prevailing professional norms" (the standard applicable to Seward's postconviction claim of ineffective assistance), and believing that it was "bound" by the postconviction court's findings, "conclude[d] that [trial] counsel could [not] have done anything else to obtain" the

24

employment records from the witness, Ms. Stamathis. It therefore held that trial counsel had acted with "'due diligence' to obtain the employment records."[16]

The circuit court erred in so holding, employing the wrong standard, that is, whether trial counsel had demonstrated "incompetence under 'prevailing professional norms,'" *Richter*, *supra*, 562 U.S. at __, 131 S. Ct. at 788 (quoting *Strickland*, 466 U.S. at 690), as it adopted the postconviction court's finding that Seward's trial counsel had not performed deficiently under *Strickland* and then held that this finding compelled, in turn, the conclusion that trial counsel had also satisfied the "due diligence" required under Rule 4-331(c) and CP § 8-301. As we have previously explained at some length, for trial counsel to pass the *Strickland* test, his performance need only exceed the low bar of "incompetence under prevailing professional norms," whereas, for trial counsel to satisfy the "due diligence"

---

[16]The court also "independently" found that trial counsel "was unaware of what" those records would have shown and that it could "conceive of no mechanism whereby [trial counsel] could have obtained the records within the ten days he had to file" a motion for new trial under Rule 4-331(a). This purported "independent" finding was clearly erroneous, for two reasons.

First, it presumed that trial counsel had to have actual knowledge of what Ms. Stamathis's records would have disclosed, when due diligence charged him "with notice of all facts which [a reasonable] investigation would in all probability have disclosed if it had been properly pursued." *Argyrou*, 349 Md. at 603 (quoting *Poffenberger*, *supra*, 290 Md. at 636). Given Ms. Stamathis's testimony at Seward's trial, a "person of ordinary prudence" would have undertaken such an investigation. *Id.* (quoting *Poffenberger*, 290 Md. at 636).

And second, the actual innocence court itself recognized that there *was* a "mechanism whereby [trial counsel] could have obtained the records within the ten days he had to file" a motion for new trial under Rule 4-331(a)," namely a subpoena duces tecum, but he never pursued that mechanism.

25

demanded by Rule 4-331(c) and the actual innocence statute, CP § 8-301, his performance must meet the different (and not entirely overlapping) standard of acting "reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him." *Argyrou*, 349 Md. at 605.

The decision whether to grant a petition for writ of actual innocence lies within the discretion of the circuit court, *see Douglas*, *supra*, 423 Md at 188; *Keyes*, *supra*, 215 Md. App. at 669-70 & n.6, but "an exercise of discretion based upon an error of law is an abuse of [that] discretion" and usually requires reversal. *Bass v. State*, 206 Md. App. 1, 11 (2012) (citation and quotation omitted). Given the imposition by the court below of the wrong standard, we therefore shall reverse. Although, ordinarily, we remand so that the circuit court can exercise its discretion under the correct legal standard, the facts were sufficiently developed below that a remand for further proceedings is unwarranted.

It is clear that Seward is not entitled to the relief he sought below, because the allegedly "newly discovered evidence," that is, the handwritten payroll records prepared by Ms. Stamathis, were known, as a result of her testimony at Seward's trial, to have existed before and at the time of trial. Those records would have purportedly verified her subsequent exculpatory testimony, at the postconviction and actual innocence proceedings, where she asserted that it would have been "impossible" for Seward to have left work at the time the crimes were committed. Although Seward insists that, at the time of trial, it was not known whether Ms. Stamathis could have found those records, nor whether they would have been

26

exculpatory, that degree of uncertainty does not excuse his trial counsel's failure to make any attempt to compel their production. Her trial testimony "put a person of ordinary prudence" on inquiry notice that the records existed and were, as later confirmed, exculpatory. *Argyrou*, *supra*, 349 Md. at 603 (quoting *Poffenberger*, *supra*, 290 Md. at 636).

Seward's trial counsel nonetheless made no effort during or even after trial to locate the records in question nor did he seek a court order to compel their production by Ms. Stamathis. In sum, trial counsel made no reasonable and good faith effort to procure Ms. Stamathis's payroll records. The records, therefore, do not qualify as "newly discovered evidence." *Id.* at 600-01 & n.9; *Love v. State*, 95 Md. App. 420, 430, *cert. denied*, 331 Md. 480 (1993).

Nor do we agree with the assertion of the court below that the only option available to trial counsel was a search warrant. There is no reason trial counsel could not have requested a subpoena duces tecum[17] requiring Ms. Stamathis to produce (or at least attempt to produce) her payroll records. Moreover, as Ms. Stamathis acknowledged during the hearing held on Seward's postconviction petition (the transcript of which is part of the record in this case), if she had received a court order, at the time of Seward's trial, to search her records, she would "had to have done it," leading us to conclude that it would have been feasible to raise a claim of newly discovered evidence in time to move for a new trial under Rule 4-331(a). If trial

---

[17]Inexplicably, during one of the hearings held on Seward's actual innocence petition, the circuit court recognized that trial counsel could have taken this action but did not, remarking, "[Defense counsel] could do a subpoena duces tecum, I suppose."

27

counsel had requested the court to issue a subpoena duces tecum, those records probably would have been produced at trial or at least within the ten-day period, following trial, for filing a motion for new trial under Rule 4-331(a).

There is yet another reason Seward's claim fails. Even if we were to assume that Seward's trial counsel, acting with due diligence, could not have procured Ms. Stamathis's payroll records in time to move for a new trial under Rule 4-331(a), it was still possible (under that assumption) to file a motion for new trial on the ground of newly discovered evidence under Rule 4-331(c). Trial counsel could have filed the latter motion at any time until one year after the mandate of this Court was received in the Baltimore County circuit court upon the conclusion of Seward's direct appeal in 1986, or, in other words, until July 1, 1987. But Seward's trial counsel failed to do so. Moreover, Seward offers no explanation as to why he did nothing to procure Ms. Stamathis's payroll records until 1996, nine years after that deadline. That failure is fatal to his claim. *See Jackson v. State*, 216 Md. App. 347, 365-66 (finding lack of due diligence where trial counsel had failed, at any time prior to one year after mandate was issued in direct appeal, to investigate educational background of State's expert witness who subsequently was found to have perjured himself as to his credentials), *cert. denied*, 438 Md. 740 (2014).

Consequently, we hold that Seward's trial counsel failed to exercise the "due diligence" required under the actual innocence statute, CP § 8-301. Because Seward has failed to present "newly discovered evidence" that "could not have been discovered in time

28

to move for a new trial under Maryland Rule 4-331," his petition for writ of actual innocence must be denied.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED. CASE REMANDED WITH INSTRUCTIONS TO REINSTATE CONVICTIONS. COSTS ASSESSED TO APPELLEE.**

29