**REPORTED**

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 2441

September Term, 2013

SAM YONGA

v.

STATE OF MARYLAND

Woodward,
Kehoe,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

Opinion by Moylan, J.

Filed: January 28, 2015

Non-proof of guilt is by no means proof of innocence. There is a critical, albeit widely neglected, distinction in the criminal law between the status of being procedurally not guilty and the far rarer status of being factually innocent. The presumption of innocence, notwithstanding its grand mellifluence, is simply a package of procedural protections for a defendant going to trial.[1] It would be more semantically modest to call it a presumption of non-guilt. Actual innocence is something else again. Our subject for analysis is the Writ of Actual Innocence.

## The Case At Hand

The appellant, Sam Yonga, was found guilty upon his plea of guilty by Judge Dana Levitz in the Circuit Court for Baltimore County on April 26, 2007 on the charge of a third-degree sexual offense. On May 15, 2013, the appellant filed a petition for a Writ of Actual Innocence pursuant to Maryland Code, Criminal Procedure Article, § 8-301. Following a full evidentiary hearing on December 12, 2013, Judge Sherrie Bailey denied the petition and this appeal followed. The single contention, precisely as posed by the appellant, is:

> On the facts of this case, did Appellant sufficiently establish such newly-discovered evidence as to justify granting him a new trial?

The two-pronged response of the State leads with a strategic counterattack, broadly challenging the very applicability of the Writ of Actual Innocence to convictions based on guilty pleas. It follows with a tactical defense, focusing in specifically on the ad hoc merits (or lack thereof) of the case at hand.

---

[1] At a criminal trial, the State has the burden of proof; it must prove every element of the crime; and the required level of persuasion is beyond a reasonable doubt.

# A Generational Mesalliance

As of November 3, 2006, Sam Yonga was a 25-year-old man living in Prince George's County. He was in a long-term quasi-marital relationship with Emily Williams, the mother of his child. Unfortunately, Yonga was also addicted to the "chat room." At the other end of his chatting was a 13-year-old girl, who lived with her mother and two younger siblings in an apartment in Baltimore County. On November 3, 2006, they agreed that Yonga would travel to Baltimore and would meet with her in the apartment where she lived, to what end we are not told. The meeting was arranged for a time the victim's mother would not be home. It was also decided that the victim would call in sick, in order to be absent from school.

The victim later acknowledged to the police that when Yonga first came into the apartment, they kissed and that there were times when he touched her breasts. She described how she and Yonga then went into her mother's bedroom and got into bed. She removed all of her clothes. He removed his pants and his underpants. She further recounted to the police that Yonga first touched her vaginal area with his hand and then attempted penile penetration.

At that fortuitous moment the victim's mother arrived home unexpectedly early. As the victim heard her mother approaching, she and Yonga leaped from the bed. As the mother walked into her bedroom, she observed her daughter, naked. Yonga below the waist was wearing only a condom. Bedlam ensued. The mother shrieked that she was going to get a knife and cut off his penis. His exodus, as he grabbed for his trousers, was accordingly precipitate. As Yonga attempted to pull on his pants while running, his cell phone dropped

from his pants pocket. Although a tell-tale clue to his identity, he did not pause to pick it up.

The mother immediately scrolled through the cell phone and came up with the phone number of Yonga's mother. She dialed that number and informed the mother of what had taken place. Yonga's mother provided the victim's mother with Yonga's name, phone number, and address, all of which were ultimately passed on to the Baltimore County Police.

The mother first took her daughter to a "local clinic" where she asked for an examination for STDs (sexually transmitted diseases). The victim also received a Depo-Provera shot, "which would be a birth control implant." She then called the Baltimore County Police. Detective Jessica Hummel of the Sex Offense Unit took charge of the investigation. When she ultimately made telephone contact with Yonga, he claimed to have no idea why the detective was calling and insisted that he had never been in Baltimore County. When Detective Hummel probed further, Yonga hung up.

A day later and after a three-hour stand-off, Yonga was arrested in Prince George's County and was transported to Baltimore County. After being Mirandized, he agreed to give Detective Hummel a statement. He initially denied ever having been in Baltimore County and denied having any knowledge of the victim. He ultimately admitted, however, that he had met a girl on a chat line who told him that she was 19 years of age. He further admitted that he met with her in Baltimore County and went with her to her home, although he insisted that they never actually went into the house. He claimed that they were still on the porch when a woman came out of the house screaming. At that point, he deemed it discreet to flee.

Yonga was charged under a two-count criminal information, the first count charging a second-degree rape, involving sexual intercourse with a 13-year-old girl, and the second count charging a third-degree sexual offense, involving sexual contact. Pursuant to a plea bargain, the State nolle prossed the charge of second-degree rape. In return, Yonga entered a plea of guilty to the charge of a third-degree sexual offense. All of the facts above recounted are taken from the agreed statement of facts offered by the State in support of the guilty plea. When Judge Levitz asked if there were "any additions, corrections, or modifications to those facts?" Yonga's counsel replied:

> MR. FATEMI: I think Madame State has properly went over what allegedly happened, just the fact that he never went in the house and in the statement he stated that he did not have sex.

(Emphasis supplied).

On June 4, 2007, Judge Levitz, pursuant to the plea bargain, sentenced Yonga to a term of 364 days incarceration at the Baltimore County Detention Center with all but six months suspended and with no term of probation.

### A Dramatic and Diametric Change of Heart

Six years passed uneventfully by and this had, indeed, become a very cold case. Yonga had finished serving his six months at the Baltimore County Detention Center years before. He was, moreover, not on probation.

Notwithstanding their earlier problems emanating from the chat room, however, neither Yonga nor his victim could resist the lures of telecommunication. They resumed a conversational relationship on Facebook and soon became good friends. According to her later statements, the victim was shocked to learn that Yonga had earlier been found guilty

of a crime, a crime which she now was ready to swear had never happened. She claimed not to know that he had even been prosecuted. The victim's mother, once brought into the loop, apparently felt the same latter-day sympathy. The victim and Yonga together went to defense counsel's office and informed him of "the miscarriage of justice" which they stated had occurred.

On May 15, 2013, Yonga filed his Petition for a Writ of Actual Innocence pursuant to Maryland Code, Criminal Procedure Article, § 8-301 and Maryland Rule 4-332. A full evidentiary hearing on the petition was heard by Judge Sherrie Bailey on December 12, 2013. At the conclusion of the hearing, Judge Bailey ruled:

> After careful consideration and review of the transcript as well as the police reports submitted and the testimony and argument presented before the Court, most respectfully, [Defense Counsel], <u>your request is denied</u>.
>
> <u>There are simply too many inconsistencies. The transcript indicates that this young lady was given a Depo-Provera shot at the clinic that she was taken to, there are too many details. It just defies comprehension.</u>
>
> While, I do sympathize with the immigration issues and while I do understand what is patently obvious that [the victim] and the [her mother] clearly are attempting to do, most respectfully <u>I don't believe a word that they said today</u>. It just – they just – <u>they're trying to help Mr. Yonga</u>, quite honestly, <u>and that's very patently clear.</u>

(Emphasis supplied). This appeal has followed.

## The Writ of Actual Innocence

As a new addition to the ranks of postconviction reviews, the Writ of Actual Innocence was enacted by Chapter 744, § 1, of the Acts of 2009. It became effective as of October 1, 2009, and is now codified as Maryland Code, Criminal Procedure Article, § 8-301. Its substantive thrust is contained in subsection (a).

(a) <u>Grounds</u>. – <u>A person charged</u> by indictment or criminal information with a crime triable in circuit court <u>and convicted</u> of that crime may, at any time, <u>file a petition for writ of actual innocence</u> in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:

(1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and

(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

(Emphasis supplied).

That law is implemented by Maryland Rule 4-332. Its essential content is set out, in pertinent part, in subsection (d):

(d) <u>Content of petition</u>**.** <u>The petition</u> shall be in writing, shall be signed by the petitioner or the petitioner's attorney, and <u>shall state</u>:
....
(3) <u>each offense of which the petitioner was convicted</u>, the date of the judgment of conviction, and the sentence imposed;
(4) <u>if the judgment was appealed</u>, the case number in the appellate court, a <u>concise description of the issues raised in the appeal, the result, and the date of the appellate court's mandate</u>;
....
(7) a description of the newly discovered evidence, how and when it was discovered, why it could not have been discovered earlier, and, if the issue of whether the evidence could have been discovered in time to move for a new trial pursuant to Rule 4-331 was raised or decided in any earlier appeal or postjudgment proceeding, the identity of the appeal or proceeding and the decision on that issue;
(8) that the newly discovered evidence creates a substantial or significant possibility, as that standard has been judicially determined, that the result may have been different, and the basis for that statement;
(9) <u>that the conviction sought to be vacated is based on an offense that the petitioner did not commit.</u>

(Emphasis supplied).

The first opinion to explore in any detail the Writ of Actual Innocence was <u>Douglas v. State</u>, 423 Md. 156, 31 A.2d 250 (2001). As its secondary holding, <u>Douglas</u>, established that if a petition for a Writ of Actual Innocence satisfies the pleading requirements, an actual hearing on the motion is mandatory. The primary holding of <u>Douglas v. State</u> was that the denial of a petition for a Writ of Actual Innocence is a final judgment which may be immediately appealed. Chief Judge Krauser's opinion for this Court in <u>State v. Seward</u>, _____ Md. App. _____, _____ A.3d _____ (2014) (No. 2294, September Term, 2012, filed on October 28, 2014), completed the appealability cycle as it held that a grant of a Writ of Actual Innocence is equally appealable by the State. "[W]e are impelled to conclude that a right of appeal from a decision on an actual innocence petition must be a bilateral right of appeal."

In terms of first recognizing the new Writ of Actual Innocence, <u>Douglas v. State</u> was preceded by <u>State v. Matthews</u>, 415 Md. 288, 999 A.2d 1050 (2010). <u>Matthews</u>, to be sure, began as and essentially remained a case involving a Motion for New Trial under Rule 4-331(c). The opinion for the Court of Special Appeals in its <u>Matthews v. State</u>, 187 Md. App. 496, 979 A.2d 198 (2009), holding <u>inter alia</u> that the new trial motion in that case had not been timely filed, came out before the Writ of Actual Innocence was yet on the books. By the time the Court of Appeals filed its opinion, however, the Writ of Actual Innocence had been made available. The Court of Appeals opinion held that even an untimely new trial motion under Rule 4-331(c) might still outflank the filing deadline by morphing into the new and closely related Writ of Actual Innocence, if the writ's other conditions were satisfied. "In conclusion, we hold that Matthews's motion [for a new trial] may be treated on remand

as a Petition for Writ of Actual Innocence under Section 8-301 of the Criminal Procedure Article." 415 Md. at 312.

In <u>Keyes v. State</u>, 215 Md. App. 660, 84 A.3d 141 (2014), the petition for a Writ of Actual Innocence was properly denied where the newly discovered evidence was only of an impeaching character. In <u>Jackson v. State</u>, 216 Md. App. 347, 369, 86 A.3d 97 (2014), newly discovered evidence that the State's ballistics expert had lied about his academic credentials may have been pertinent to impeach his credibility but was not material to the issue of Jackson's actual innocence. <u>Hawes v. State</u>, 216 Md. App. 105, 85 A.3d 291 (2014), was an appeal from a denial of a petition for a Writ of Actual Innocence. The denial was affirmed, but under the closely related framework of analysis that the petitioner had failed to show that the newly discovered evidence could not have been timely discovered in time to file for a new trial pursuant to Rule 4-331(c).

Criminal Procedure Article, § 8-301(g) should also be carefully noted:

> (g) <u>Burden of proof.</u> – A petitioner in a proceeding under this section has the burden of proof.

<u>Douglas v. State</u>, 423 Md. at 188, was also very clear that in granting or denying a petition for a Writ of Actual Innocence, the appellate courts will apply to the trial judge's decision the abuse of discretion standard:

> [D]ecisions on the merits of requests for new trials based on newly discovered evidence, <u>whether filed pursuant to Rule 4-331 or the C.P. § 8-301, are committed to the hearing court's sound discretion.</u>

(Emphasis supplied). See also <u>Miller v. State</u>, 380 Md. 1, 28, 843 A.2d 803 (2004); <u>Jackson v. State</u>, 216 Md. App. 347, 363, 86 A.3d 97 (2014).

## The Writ's Unique Feature:
## Actual Innocence Is Different From Procedural Error

The key difference between a general Motion for New Trial under Rule 4-331(c)(1) and a petition for a Writ of Actual Innocence is in the substantive nature of the thing that the newly discovered evidence must show. Assuming that both satisfy the required burden of persuasion that the new evidence "creates a substantial or significant possibility that the result may have been different," there still remains a major qualitative difference. For a new trial generally under Rule 4-331(c)(1), it is enough that the newly discovered evidence expose procedural flaws in the trial that denied the petitioner due process of law. That would be enough to grant a new trial generally. That would not be enough, however, to grant a Writ of Actual Innocence. As the Supreme Court noted in Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." An actually guilty person may, as readily as an actually innocent person, suffer due process violations.

To have one's conviction reversed because of a non-Mirandized confession or an unreasonable search and seizure does not thereby make one actually innocent. Most defendants who suffer such violations are, indeed, not actually innocent. That sorry reality is why the newly discovered evidence that might expose grave procedural and even constitutional error is still subject to the one-year filing deadline of Rule 4-331(c)(1). There is a limit to the law's procedural compassion. Due process even for the guilty is one of the law's moral principles. Even moral principles, however, are relative. Due process for the guilty, albeit highly valued, is not as relatively pressing a concern as in the vindication of those who are actually innocent. The chance to prove actual innocence, therefore, by contrast

to procedural error, is not inhibited by a filing deadline. Although we care for due process, we care even more for actual innocence. As the obvious bridge between the new trial motion based on newly discovered evidence, and the Writ of Actual Innocence, both of the more recent additions to Rule 4-331(c), to wit, (c)(2) dealing with capital punishment cases and (c)(3) dealing with DNA, eliminate the one-year filing deadline but both require that the newly discovered evidence point toward actual innocence.

## Origins in the DNA Revolution

Courts and Judicial Proceedings Article, § 8-301, did not, like Athena from the brow of Zeus, spring full-blown into existence on October 1, 2009. Its seeds had been germinating for fully ten years. Its words, therefore, may not be parsed in a vacuum. To understand the new Writ of Actual Innocence law, one must understand the direct lineal antecedent that produced it. The unquestioned precursor was the revolution in forensic investigation resulting from the rapidly evolving science of DNA identification. Beginning in the 1980's, DNA's investigative sweep far outranged that of fingerprinting and its conclusions were recognized as yielding scientific certainty. The growing recognition of its sure-fire identification potential, in cold cases long after the fact, hit a sensitive national nerve, especially with respect to death penalty cases. Within less than 20 years, a rivulet became a torrent.

The sensitive social problem was that the imposition of capital punishment was irrevocable. It posed for many in the wide-ranging national debate the anguished question, "How can we be sure we have not executed an innocent person?" The concern was not with executing someone who might have been procedurally not guilty. Fifty years of the Warren

Court Revolution provided all the reassurance we needed on that score. The concern was with actual, factual innocence. John M. Leventhal, "A Survey of Federal and State Courts' Approaches to a Constitutional Right of Actual Innocence," 76 Alb. L. Rev. 1453, 1454 (2002-2013) ("Judge Leventhal"), posed the critical question:

> Should a defendant convicted of a capital offense and sentenced to death, who was not deprived of any constitutional right at trial be executed, when the defendant was actually innocent? Should any defendant who suffered no other violation of a constitutional right and received a fair trial remain incarcerated when the defendant is actually innocent? [2]

Maryland passed in 2001 what is now Criminal Procedure Article, § 8-201, providing for a convicted defendant's right to apply for and be guaranteed court-ordered DNA testing under certain circumstances. See Comment, "Clearly Erroneous: The Court of Appeals of Maryland's Misguided Shift to a High Standard for Post-Conviction DNA Relief," 71 Md. L. Rev. 886 (2012) ("Clearly Erroneous"); Comment, "Innocence and Incarceration: A Comprehensive Review of Maryland's Postconviction DNA Relief Statute and Suggestions For Improvement," 42 U. Balt. L.F. 65 (Fall 2011) ("Innocence and Incarceration"). There is no question that Maryland's first DNA statute was aimed at facilitating the exoneration of those convicted defendants who were actually innocent of the crime for which they had been convicted. Blake v. State, 395 Md. 213, 219, 909 A.2d 1020 (2006), set out the purpose of the new statute:

> Section 8-201 was enacted in Maryland in 2001, in line with a nationwide trend to adopt postconviction DNA testing statutes designed to provide an avenue for the exoneration of the actually innocent.

---

[2] See also Daniel S. Medwed, "Up the River Without a Procedure: Innocent Prisoners and Newly Discovered Non-DNA Evidence in State Courts," 47 Ariz. L. Rev. 655 (Fall 2005) ("Prof. Medwed").

(Emphasis supplied). <u>Gregg v. State</u>, 409 Md. 698, 715, 976 A.2d 999 (2009), re-affirmed

that narrow and specific purpose:

> Section 8-201 is also a remedial statute, as <u>its purpose is to provide a</u>
> <u>remedy for persons convicted of serious crimes of which they are actually</u>
> <u>innocent.</u>

(Emphasis supplied). See also <u>Thompson v. State</u>, 411 Md. 664, 679, 985 A.2d 32 (2009).

The leitmotif of "actual innocence" resonates throughout the caselaw.

Criminal Procedure, § 8-201 was primarily concerned with the right to require DNA

testing and with various technological problems associated with that testing. It remained to

be seen, however, what the courts would do with the test results. What the Court of Appeals

and the Rules Committee did initially was to expand Maryland Rule 4-331(c) dealing with

a Motion for New Trial based on newly discovered evidence. The original version of the

rule with its one-year filing deadline was placed in subsection (c)(1). In 1997 subsection

(c)(2) had earlier been added, eliminating the one-year filing deadline for cases where the

death penalty had been imposed. To accommodate the new DNA phenomenon, subsection

(c)(3) was then added on November 1, 2001. The Motion for New Trial could be "filed at

any time if the newly discovered evidence is based on DNA identification testing." In <u>State</u>

<u>v. Matthews</u>, 415 Md. at 305, Judge Battaglia explained:

> In 2001, we again amended Rule 4-331(c) to permit a motion for new
> trial "at any time," under specified circumstances, <u>for a defendant who alleges</u>
> <u>newly discovered DNA evidence.</u> ... Our decisions to remove the filing
> deadlines in strictly enumerated cases make sense only under the assumption
> that we had regarded the one year time limit otherwise required in Rule 4-
> 331(c) as imposing a hard deadline.

(Emphasis supplied). Significantly, the new subsection (c)(3) also provided that the test

results, if proved, would have to "<u>show that the defendant is innocent of the crime of which</u>

the defendant was convicted." (Emphasis supplied). A procedurally flawed trial was not enough. Actual innocence was the sine qua non for the removal of the filing deadline.

Once it was accepted that a claim of actual innocence based on the use of DNA technology could be used to challenge enrolled convictions without any filing deadline, a second wave of reform developed for the closely related proposition that any newly discovered proof of actual innocence should also be permitted to do so, whether based on DNA technology or on any other equally persuasive evidentiary source. As Chief Judge Krauser observed in State v. Seward, ____ Md. App. at ____ n.10:

> [T]he legislative materials suggest that the actual innocence statute was conceived, by its proponents, as a means to extend the relief afforded under the DNA postconviction statute to those for whom DNA evidence was unavailable.

(Emphasis supplied).

Although it took eight years to take the step, it was still just a short step from Maryland Rule 4-331(c)(3) to Criminal Procedure Article, § 8-301. Both dealt with motions for a new trial without a filing deadline based on newly discovered evidence. The newly discovered evidence in the first case was DNA identification evidence that could prove the defendant "innocent of the crime." The newly discovered evidence in the second case was evidence of "actual innocence." But for that element of innocence, the Motion for a New Trial would still have been subjected to the one-year filing deadline of Rule 4-331(c)(1). In terms of its essential character, the new Writ of Actual Innocence law is but a minor variation of Rule 4-331.

## The Burden of Persuasion Is Not the Probandum

In one sense, the somewhat awkward arrangement of § 8-301 has created an unfortunate possibility for confusion. The substantive object that has to be asserted and then supported by an adequate show of proof is set out in the very wording of the subtitle – "Petition for writ of actual innocence" – and then again in describing what the petition seeks, to wit, "a writ of actual innocence." In then reciting what the petition must claim, however, subsection (a) seems to take the element of actual innocence for granted as it further provides that

> [a] person ... may ... file a petition for writ of actual innocence ... if the person claims that there is newly discovered evidence that:
> (1) creates a substantial or significant possibility that the result may have been different[.]

(Emphasis supplied).

A hasty or careless reading of that passage in a vacuum could lead the unwary to the erroneous conclusion that the petition for the writ may assert any newly discovered evidence that "creates a substantial or significant possibility that the result may have been different." That is not only not the case; it is absurd. The words, in a vacuum, could be taken to refer to procedural flaws in the trial as well as to cases of actual innocence. The words, however, have a limiting context that is only several lines away. What the petition must show is newly discovered evidence that the petitioner is actually innocent. The "substantial or significant possibility that the result may have been different" is simply the weight or level of persuasion that the newly discovered evidence of actual innocence must possess in order to justify the issuance of the writ. A mere bald assertion of actual innocence or some highly

speculative or unsupported claim of actual innocence is not enough to justify the granting of a writ. The claim must be substantial enough for the hearing judge to conclude that there may, indeed, be a plausible case of actual innocence. A careless reading of the awkward wording, however, could readily lead to the mistaken belief that the mere quantitative expression of the necessary level of persuasion is the substantive or qualitative thing that the writ is all about. It is not.

With respect to new trial motions based on newly discovered evidence generally the test that "substantial or significant possibility that the result may have been different" is indisputably recognized as the required level of persuasion. This persuasive test is something that the Writ of Actual Innocence and the rest of Rule 4-331(c) have in common. It is not a thing that sets them apart. It is only an adjectival qualifier. It is not the thrust of the writ. If this were not so, if the mere level of required proof were ipso facto the ultimate thing to be proved, there would be no difference between the Writ of Actual Innocence, with no filing deadline, and Rule 4-331(c)(1), with a one-year filing deadline. That is obviously not the case.

With an effective date of October 1, 2011, the Court of Appeals, with the assistance of the Rules Committee, promulgated a new rule, Rule 4-332, to implement the Writ of Actual Innocence statute. Whereas the statute itself, as we have been discussing, was somewhat awkwardly worded, Rule 4-332 is perspicuously clear. Subsection (d) lists the required contents of the petition for the writ. Subsections (d)(8) and (d)(9), unambiguously in the conjunctive, list respectively both the level of persuasion of the newly discovered evidence (8) and the ultimate substantive fact of actual innocence (9):

(8) that the newly discovered evidence creates a substantial or significant possibility, as that standard has been judicially determined, that the result may have been different, and the basis for that statement;

(9) that the conviction sought to be vacated is based on an offense that the petitioner did not commit[.]

(Emphasis supplied).

Even if the new statute was awkwardly worded, its very title should resolve any ambiguity. As Judge (now Chief Judge) Barbera noted in Douglas v. State, 423 Md. at 176:

C.P. § 8-301 provides a defendant an opportunity to seek a new trial based on newly discovered evidence that speaks to his or her actual innocence, as evident from the title of the statute itself.

(Emphasis supplied).

The very title of § 8-301 as a "Petition for writ of actual innocence" prominently proclaims its purpose. As Judge Harrell told us in Mayor & Council of Rockville v. Rylyns Enterprises, Inc., 372 Md. 514, 814 A.2d 469 (2002), to interpret a statutory provision, we must view it "as a whole, and as part of the larger statutory scheme."

It is "well settled" that "the title of an act is relevant to the ascertainment of its intent and purpose.

Id. at 555, 814 A.2d at 493 (quoting MTA v. Baltimore County Revenue Authority, 267 Md. 687, 695-96, 298 A.2d 413 (1973)) (emphasis supplied). It is also of interpretive significance that § 8-301 is codified as a part of Subtitle 3 dealing with "Newly Discovered Evidence."

The required level of persuasion for newly discovered evidence to make a decisive difference is by no means the same as the thing that the newly discovered evidence is offered

- 16 -

to prove, although a careless reading of Criminal Procedure Article, § 8-301 might conflate the two. The burden of persuasion is not the probandum.

This then is the Writ of Actual Innocence, what it is and what it is not.

## The Writ of Actual Innocence Is Not Available
## To Challenge a Conviction Based Upon a Guilty Plea

We fully agree with the State's broad strategic challenge that the Writ of Actual Innocence was never designed to challenge a conviction based on a guilty plea. A defendant cannot with one breath 1) agree to enter a guilty plea and to accept the benefits of a conviction based on that guilty plea and 2) seek to vacate that very conviction by claiming that he is actually innocent of the crime.[3] In Metheny v. State, 359 Md. 576, 599-600, 755 A.2d 1088 (2000), the Court of Appeals has given us a definitive statement of what the very entering of a guilty plea says about the defendant's formally acknowledged criminality.

> A guilty plea "is an admission of conduct that constitutes all the elements of a formal criminal charge." "By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime." Indeed, "'[a] plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need [be] advanced .... It supplies both evidence and verdict, [thus] ending [the] controversy.'" Once accepted, a guilty plea amounts to a conviction and the only remaining tasks for the court to perform are to impose judgment and conduct sentencing proceedings. The fact that no jury or bench trial is conducted does not make a guilty plea any less functional as a conviction.

---

[3]If nothing else, he would be breaching the agreement he had made with the State after having received the benefit of that agreement. What the consequences might be that he should suffer for such a breach we need not consider in this case. See, e.g., Cubbage v. State, 304 Md. 237, 498 A.2d 632 (1985) ("[T]he better rule is to hold the defendant to the knowing and voluntary waiver which he made. Once the appellate court confirms that the waiver is indeed knowing and voluntary, the appeal going to the merits of the judgment of conviction should be dismissed.").

(Emphasis supplied; citations omitted).

A Writ of Actual Innocence contemplates a petitioner who has properly been found guilty of a crime by the verdict of a jury (or judge sitting as a jury) after a trial on the merits. A Writ of Actual Innocence would invalidate such a trial verdict. Even a finding of actual innocence would not, on the other hand, negate a validly entered guilty plea. A conviction by a trial verdict and a conviction based on a guilty plea are fundamentally different phenomena and may not casually be equated with each other. There is, moreover, a logical disconnect in using a Writ of Actual Innocence to try to invalidate a guilty plea. A conviction following a trial embodies the core finding that the defendant actually committed the crime. A Writ of Actual Innocence proceeds on the opposite assumption that the convicted defendant did not commit the crime. These two antithetical findings are incompatible. The latter logically negates the former.

A valid guilty plea, on the other hand, is not necessarily incompatible with actual innocence. A guilty plea may only be reversed by a showing either that it was not voluntary or that it was not knowledgeable or that it was not supported by an adequate statement of its factual basis. If a guilty plea is both voluntary and knowing, it will not be invalidated by proof of actual innocence.

There is a logical disconnect between a conviction following a trial and actual innocence. They should not coexist. There is, however, no such necessary disconnect between a conviction based on a voluntary and knowing guilty plea and actual innocence. For a variety of reasons, they may coexist. The appellant can point to no case or academic

authority countenancing the use of a Writ of Actual Innocence to deconstruct a valid guilty plea. He simply takes it for granted. We do not.

Even were the facts that are alleged by a petitioner for a Writ of Actual Innocence available to that defendant within 30 days of the judgment of conviction based on a guilty plea, the defendant could not take an appeal challenging his guilty plea based on those facts. Courts and Judicial Proceedings Article, § 12-302(a)(2) squarely provides:

> Section 12-301 of this subtitle does not permit an appeal from a final judgment entered following a plea of guilty in a circuit court. Review of such a judgment shall be sought by application for leave to appeal.

(Emphasis supplied). See Bruno v. State, 332 Md. 673, 688, 632 A.2d 1192 (1993) ("By pleading guilty ... a defendant forfeits any right to a direct appeal, and ordinarily waives all non-jurisdictional defects in the proceedings."); McElroy v. State, 90 Md. App. 48, 54, 599 A.2d 1215 (1992); Ward v. State, 83 Md. App. 474, 478-79, 575 A.2d 771 (1990); Boone v. State, 56 Md. App. 8, 9, 466 A.2d 66 (1983).

We consider this prohibition on using an appeal from a trial as an avenue for challenging a guilty plea, which does not involve a trial, as similarly prohibiting the use of a petition for a Writ of Actual Innocence to challenge a guilty plea. As Professor Medwed, supra, pointed out at 666, "From the outset, motions for a new trial were normally filed with the original trial judge who presided over the case." (Emphasis supplied). Rule 4-332(b) expressly provides that an "action for a writ of actual innocence is commenced by the filing of a petition in the court where the conviction took place." As Ruby v. State, 353 Md. 100, 111, 724 A.2d 673 (1999), points out:

> [P]etitioner's <u>original criminal trial, subsequent motion for new trial,</u>
> and the <u>belated appeal</u> of the denial of petitioner's last Motion for New Trial
> all <u>were part of the criminal case.</u>

(Emphasis supplied).

The Comment "Innocence and Incarceration," <u>supra</u> at 93-94, was firm in its conclusion.

> To have DNA testing ordered in Maryland, a petitioner must show a reasonable probability that testing will produce exculpatory evidence. <u>Under most circumstances, the facts alleged in a petition for postconviction relief will necessarily, in part, be drawn from the trial record.</u> However, <u>when there was a guilty plea, there is no detailed trial record, no witness testimony, and often there is only a minimal factual investigation on the part of the State and defense counsel.</u> Thus, both the defense's factual quest to establish innocence as well as the State's attempt to refute innocence are hindered by the inherent gaps available <u>in evidence in cases in which the petitioner pled guilty. Petitions stemming from a conviction following a guilty plea should thus be denied.</u>

(Emphasis supplied). See also J.H. Dingfelder Stone, "Facing the Uncomfortable Truth: The Illogic of Post-Conviction DNA Testing for Individuals Who Pleaded Guilty," 45 U.S. F. L. Rev. 47, 50-51 n. 18-20 (2010) (discussing the merits of allowing offenders to challenge, through post-conviction DNA testing, convictions to which they pled guilty).

A petition for a Writ of Actual Innocence seeks a new trial. A guilty plea, however, was not a trial. There cannot be a new trial when there has never been an old trial. A guilty plea is simply not a part of the trial process. The appellant points to no case where a Motion for New Trial has been used to challenge the validity of a guilty plea.

### The Testing Mechanism Will Not Work on a Guilty Plea

In the case of a request for a new trial based on newly discovered evidence of actual innocence, moreover, the universally applied method for gauging the substantiality of the

claim is impossible to apply in the case of a guilty plea.  In assessing the impact of newly

discovered evidence, the court must look at the original trial in front of the original jury and

then hypothesize submitting the newly discovered evidence to that original jury.  It must

then ask, in the precise words of Rule 4-432(d)(8), whether "the newly discovered evidence

creates a substantial or significant possibility ... that the result may have been different."[4]

There is, however, no way to compare the trial that was with the trial that might have

been when there was no trial that was.  Where there was no trial, it would be utter

speculation to attempt to construct what the imaginary trial might have consisted of.  We

may not hypothesize a mythical trial.  The statement of facts offered in support of the guilty

plea is only minimalist.  A State's Attorney's Office going before a jury would almost

certainly opt for a more maximal case of guilt.  We do not know, therefore, what witnesses

would have been called or what, under direct and cross-examination, they might have said.

We do not know whether the appellant would or would not have testified and, if he did

---

[4]The Maryland test for assessing the persuasiveness of newly discovered evidence in all new trial motion cases was adopted by the Court of Appeals in Yorke v. State, 315 Md. 578, 556 A.2d 230 (1989). After evaluating the various tests being applied in state and federal courts, Judge Orth announced the carefully crafted Maryland standard:

> We appreciate that it is impossible to formulate a litmus type test that would come up with a "yea" or "nay" as to whether the new evidence would change the verdict. We favor, however, a standard that falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable. We think that a workable standard is:

> The newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected.

315 Md. at 588 (emphasis supplied).  See also Isley v. State, 129 Md. App. 611, 664-66, 743 A.2d 772 (2000), overturned in part by Merritt v. State, 367 Md. 17, 785 A.2d 756 (2001).

testify, how his testimony would have held up. We do not know what medical reports might have been submitted. There would be self-evidently no way to make the prescribed comparison. Newly discovered evidence simply cannot be measured in the case of a conviction based on a guilty plea. With what cast of characters, moreover, would we people our hypothetical testing? Do we ask whether the hypothetical jury that might have rendered a guilty verdict after a hypothetical trial would probably have rendered a different verdict? Or do we ask, as in this case, whether Judge Levitz would still have accepted the guilty plea? These are very different questions. The criteria for rendering a trial verdict and the criteria for accepting a guilty plea are not remotely the same.

In every newly discovered evidence case, including newly discovered DNA evidence or other newly discovered evidence of actual innocence, there is a universally recognized procedure for measuring the persuasive weight of such newly discovered evidence. That is the "before and after" test. We first look at the evidence of guilt before the jury at the trial that led to the conviction. We then look at the newly discovered evidence. The acid test is to ask whether, if that jury had had the benefit of the newly discovered evidence as well as the evidence that was before them, would there be "a substantial or significant possibility that the result would have been different?" There is no way that such a test can be applied, however, to a conviction based on a guilty plea rather than upon a trial. The minimalist statement of facts offered in factual support of a guilty plea is no equivalent of or substitute for an actual trial. It was never intended to be.

Generally speaking, we have no firm idea what the proof of guilt might have been that the jury might have heard because there was no jury and there was no trial. Would the

- 22 -

State have mounted an "all out" strong prosecution or simply have put on an adequate prosecution?  That could make a big difference. The answer might, of course, depend not simply on the availability of the evidence but upon such other imponderables as the adequacy of the staffing of the State's Attorney's Office at a given moment, the depth of the State's Attorney's budget at a given moment, or upon how busy or unbusy the Office was with other cases on its agenda at a given moment.  Might the State, in a case such as this, have mounted a full-scale effort and hired expert computer technicians to retrieve the text of the chatting between Yonga and his victim?  Such a text may not have been critical to the <u>actus reus</u> of rape, which may have been interrupted in the nick of time by the victim's mother.  It could have been both revealing and devastating, on the other hand, as to Yonga's <u>mens rea</u>.  It is not unheard of, moreover, where the <u>actus reus</u> is ambiguous enough that it could reasonably tilt in either direction, that a damning <u>mens rea</u> could nudge an unsympathetic jury in a given direction.

At such a purely hypothetical trial, moreover, might Yonga have invoked his right to silence?  Under the facts of this case, such silence could have been fatal, whatever the Fifth Amendment instruction might be about not using his silence against him.  Or if Yonga had taken the stand, how might he have stood up against rigorous and sustained cross-examination?  We cannot know any of this and that is why the newly discovered evidence cannot possibly be measured against an unknown antecedent.  Guilty pleas simply do not lend themselves to newly discovered evidence analysis.  We would have no standard to measure the newly discovered evidence against. Q.E.D.

Indeed, at the hearing before Judge Bailey, counsel for Yonga attempted to measure his newly discovered evidence against a trial that never was. The attack on a non-existent trial was surrealistic:

> [DEFENSE COUNSEL]: ...You have certainly some other things I think that the Court can consider the absence of. Number one, there is no physical evidence in this case whatsoever. The condom that was apparently used has never been brought out. There is no SAFE exam in this case. [The Prosecutor] intimated during cross-examination of ... the victim's mother, that they had regular conversations, however, we have nothing in evidence. There's no notes, no entries in the State's file indicating, hey, you know, I talked to the victim's mom today.
>
> The victim said she – certainly at 13, she's not an infant. Certainly in the normal course a 13-year-old victim would meet with the prosecutor, would talk to the prosecutor. Oftentimes they are brought to court ahead of time to show this is what the courtroom looks like. You may have to take the stand to testify.
>
> There's some pre-litigation preparation that is done with witnesses of that age. We have no evidence of that. You have no evidence before you whatsoever that there was even a single conversation with anyone from the State's Attorney's Office. There are no records subpoenaed from the supposed clinic visit or family doctor visit that [The Prosecutor] says – I mean, it's in the police report, but the State is insistent that these hospital or doctor visits happened.
>
> There are no records that were mentioned in the police report that was written in 2006. There's certainly no records that were introduced on the day of the plea, and there's absolutely no records that were introduced today to indicate there was, in fact, a medical visit.

(Emphasis supplied).

Of course, there was nothing "in evidence." Counsel seemed oblivious to the fact that there was no trial. He analyzed a trial that never was. The guilty plea was not a trial; nor was it supposed to be. A statement of supporting facts can take three minutes. The trial could take three days. There is no way the latter can fit into the former, nor should there be. We agree with the State that a Writ of Actual Innocence is not an appropriate vehicle to

challenge a conviction based on a guilty plea. There would be no way to assess such a challenge.

## The Impregnability of Guilty Pleas
## To the Merits of Guilt or Innocence

A guilty plea is in a world of its own as a short-cut procedural modality for producing a criminal conviction, frequently as a result of plea bargaining. Post-conviction review of a guilty plea is similarly in a world of its own. It is concerned not with the admissibility or the sufficiency of the evidence or with the satisfaction of the Bill of Rights. Its very different concerns are voluntariness, knowledgability, and the supporting statement of facts. Unless and until the guilty plea is overturned, moreover, it stands as an insurmountable barrier to a plea of actual innocence. It is a formal and binding acknowledgment of guilt and is incompatible with a protestation of actual innocence.

Our core understanding of a guilty plea is found in the Supreme Court decision of Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). The Supreme Court was there emphatic about what an accepted plea of guilty represents.

> A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.

395 U.S. at 242 (emphasis supplied). The Supreme Court went on, id. at n.4, to point out that the quantity and quality of the evidence, original or newly discovered, is not an issue.

> A plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need be advanced. It supplies both evidence and verdict, ending controversy.

(Emphasis supplied; citations omitted).

Several constitutional rights are waived when a plea of guilty is entered. Among them are 1) the privilege against compelled self-incrimination; 2) the right to trial by jury; and 3) the right to confront one's accusers. 395 U.S. at 243. In emphasizing the protections that should be safeguarded by the trial judge in taking a guilty plea, the Supreme Court clearly implied that if those protections are, indeed, afforded, a conviction based on a guilty plea should thereby be "insulated from attack."

> If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, inter alia, an attempt to satisfy itself that the defendant understands the nature of the charges, his right to a jury trial, the acts sufficient to constitute the offense for which he is charged and the permissible range of sentences.

395 U.S. at 244 n.7 (emphasis supplied; citations omitted).

A post conviction petitioner of any sort must successfully challenge his guilty plea before he is free to raise other issues which the unchallenged guilty plea may have waived. One does not, moreover, challenge a guilty plea merely by implication. Pleading remains a legal requirement. Yonga in this case, for instance, has not, either in his petition for a Writ of Actual Innocence or at the hearing on that petition, challenged the validity of his guilty plea. That guilty plea is the elephant in the room that cannot be ignored, but he ignores it.

For the binding nature of an unchallenged plea of guilty, Boykin v. Alabama relied upon the Supreme Court's earlier decision in Kercheval v. United States, 274 U.S. 220, 223-24, 47 S. Ct. 582, 71 L. Ed. 1009 (1927):

> A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required .... Out of just consideration for persons

accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. When one so pleads he may be held bound.

(Emphasis supplied).

In McMann v. Richardson, 397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970), the Second Circuit Court of Appeals had, in a habeas corpus case, invalidated a guilty plea because it had been triggered by the defendant's confession which the defendant originally thought would be introduced against him but which had since been deemed unconstitutional by intervening Supreme Court law. The Supreme Court reversed. It posed the question before it:

> The issue on which we differ with the Court of Appeals arises in those situations involving the counseled defendant who allegedly would put the State to its proof if there was a substantial enough chance of acquittal, who would do so except for a prior confession that might be offered against him, and who because of the confession decides to plea guilty to save himself the expense and agony of a trial and perhaps also to minimize the penalty that might be imposed. After conviction on such a plea, is a defendant entitled to a hearing, and to relief if his factual claims are accepted, when his petition for habeas corpus alleges that his confession was in fact coerced and that it motivated his plea? We think not if he alleges and proves no more than this.

397 U.S. at 767-68 (emphasis supplied).

A mistaken guess about the admissibility of a confession will not invalidate a guilty plea:

> A more credible explanation for a plea of guilty by a defendant who would go to trial except for his prior confession is his prediction that the law will permit his admissions to be used against him by the trier of fact. At least the probability of the State's being permitted to use the confession as evidence is sufficient to convince him that the State's case is too strong to contest and that a plea of guilty is the most advantageous course. Nothing in this train of events suggests that the defendant's plea, as distinguished from his confession, is an involuntary act. His later petition for collateral relief asserting that a coerced confession induced his plea is at most a claim that the admissibility

- 27 -

of his confession was mistakenly assessed and that since he was erroneously advised, either under the then applicable law or under the law later announced, his plea was an unintelligent and voidable act. The Constitution, however, does not render pleas of guilty so vulnerable.

397 U.S. at 769 (emphasis supplied).

A misassessment of the strength of the State's case, even if defense counsel is responsible for the misassessment, will not invalidate a guilty plea.

All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. ... Waiving trial entails the inherent risk that the good faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

397 U.S. at 769-70 (emphasis supplied).

A tactical mistake by defense counsel, moreover, does not mean that the attorney was incompetent or ineffective.

That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing. ... That this Court might hold a defendant's confession inadmissible in evidence, possibly by a divided vote, hardly justifies a conclusion that the defendant's attorney was incompetent or ineffective when he thought the admissibility of the confession sufficiently probable to advise a plea of guilty.

397 U.S. at 770 (emphasis supplied).

In Brady v. United States, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970), a defendant, eight years after having pled guilty, attempted to attack the voluntariness of that plea on the ground that it had been coerced because of his fear of the death penalty. The Supreme Court rejected that attack upon the plea.

One of these circumstances was <u>the possibility of a heavier sentence following a guilty verdict after a trial. It may be that Brady</u>, faced with a strong case against him and <u>recognizing that his chances for acquittal were slight, preferred to plead guilty</u> and thus limit the penalty to life imprisonment rather than to elect a jury trial which could result in a death penalty. But <u>even if we assume that Brady would not have pleaded guilty except for the death penalty</u> provision of § 1201(a), this assumption merely identifies the penalty provision as a "but for" cause of his plea. <u>That the statute caused the plea in this sense does not necessarily prove that the plea was coerced and invalid as an involuntary act.</u>

397 U.S. at 749-50 (emphasis supplied).

The Supreme Court made clear that much guesswork is involved in judging the strength of the State's case and in predicting likely punishment. Ill-advised guesses, however, do not invalidate otherwise voluntary and knowing pleas of guilty.

<u>Often the decision to plea guilty is heavily influenced by the defendant's appraisal of the prosecution's case</u> against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; <u>judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time.</u> The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. <u>A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case</u> or the likely penalties attached to alternative courses of action.

397 U.S. at 756-57 (emphasis supplied).

Our point is that the criteria for reviewing a trial conviction and the criteria for reviewing a guilty plea are completely different. The two sets of criteria do not commingle. In <u>United States v. Broce</u>, 488 U.S. 563, 109 S. Ct. 757, 102 L. Ed. 2d 927 (1989), a voluntary and knowing guilty plea was held to foreclose the very consideration of a double jeopardy claim.

> [W]hen the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, <u>the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.</u>  ... <u>The general rule applies here to bar the double jeopardy claim.</u>

488 U.S. at 569 (emphasis supplied).

If the guilty plea remains in effect and the guilty plea criteria have been satisfied, other forms of collateral attack are barred even though that attack could be lethal if applied to a conviction after a trial with its very different set of controlling criteria.

> <u>Respondents</u> have not called into question the voluntary and intelligent character of their pleas, and <u>therefore are not entitled to the collateral relief they seek.</u>

488 U.S. at 574 (emphasis supplied).

Because of the unique nature of the guilty plea, even grave matters of fundamental or constitutional dimension are beyond the pale of post conviction consideration.  In <u>Tollett v. Henderson</u>, 411 U.S. 258, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973), the habeas corpus petitioner challenged his guilty plea because the grand jury that had indicted him had been chosen by a selection process that was racially discriminatory.

> [R]espondent's guilty plea here alike forecloses independent <u>inquiry into the claim of discrimination</u> in the selection of the grand jury.

411 U.S. at 266 (emphasis supplied).  And see <u>Mabry v. Johnson</u>, 467 U.S. 504, 508, 104 S. Ct. 2543, 81 L. Ed. 2d 437 (1984) ("It is well settled that <u>a voluntary and intelligent plea of guilty</u> made by an accused person, who has been advised by competent counsel, <u>may not be collaterally attacked.</u>"  (Emphasis supplied)).

Direct attack on a guilty plea is an attack on its voluntary or knowing character and upon whether its statement of supporting facts alleges a criminal offense. A non-reversed guilty plea is invulnerable to a Writ of Actual Innocence.

### The State's Tactical Fall-Back Position

As its tactical second line of defense, the State contends that even if the unreversed and unchallenged guilty plea were not a bar to the petition for a Writ of Actual Innocence, the petition in this case would nonetheless fail for a variety of ad hoc reasons. Let us, therefore, assume, purely arguendo, that a Writ of Actual Innocence is an appropriate vehicle to challenge a conviction based on a valid guilty plea. How then might the case now before us play out?

The bare-bones petition for a Writ of Actual Innocence does not tell us much. The description of the allegedly Newly Discovered Evidence consisted exclusively of the following:

> [The petitioner] indicated that he had become social friends with the victim, who is now 20 years of age, and that she was disputing the State's version of events in this case, in effect "recanting" her prior statement and disputing her mother's statement that sexual intercourse had occurred with Petitioner.

> On March 4, 2013, the victim ... presented herself at the undersigned's law office in Towson. She indicated that her mother made the initial allegations in this case. She claims that when she was interviewed by the police she told them that there was no sexual intercourse or sexual contact between herself and Petitioner. She further indicated that she was never interviewed by the prosecutor handling the case or defense counsel, and that she was informed by her mother that she did not need to come to court for trial. She indicated that due to her young age at the time she felt "helpless" and unable to stop the prosecution. She wants to come forward to testify in order to "set things right" and clear Petitioner's name.

The petition raises its single contention in the following terms:

> THERE IS A SUBSTANTIAL POSSIBILITY THAT THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT IF THE VICTIM HAD BEEN CALLED TO THE STAND AND RECANTED AND/OR DISPUTED THE STATE'S VERSION OF THE FACTS.

The argument then offered in support of that contention is exclusively as follows:

> Under § 8-301, this Court can and should now consider the newly discovered evidence of the victim's disputation of the State's allegations in weighing whether, in the interests of justice, this evidence justifies reopening this case and granting a new trial. <u>This is evidence that was not presented at trial</u>, and <u>it creates a substantial possibility</u> under the statute <u>that the Petitioner would not have been convicted if this evidence had been presented to a jury.</u> This new evidence must be considered by the trier of fact, and forms a solid basis upon which this Court should vacate the verdict in this matter and grant a new trial. The victim is eager to testify at both a hearing on the instant Petition and at a new trial.

(Emphasis supplied).

The argument is on its face bizarre. He refers to "evidence that was not presented at trial." Of course, it was not presented at trial because there was no trial. The petition speaks of "a substantial possibility ... that the Petitioner would not have been convicted if this evidence had been presented to a jury." There was no jury. Yonga is fighting a ghost. The petitioner, with his guilty plea, waived his right to a jury when he waived his right to a trial.

It sounds as if the petitioner might be questioning the wisdom of his guilty plea. We cannot make for him, however, a contention he does not make for himself. In his petition, no challenge is made to the guilty plea. In this appeal, no challenge is made to the guilty plea. At the hearing before Judge Bailey on December 12, 2013, no challenge was made to the guilty plea. Are we being asked to assert for him a claim he does not assert for himself?

At the hearing before Judge Bailey, the petitioner called two witnesses, the 13-year-old victim and the victim's mother. The petitioner himself, however, chose not to testify at that hearing. Neither did he offer any affidavit or indicate to Judge Bailey his thought process in any way. He offers no clue as to what he may or may not have been told before entering his plea, into what he was thinking, or why he did what he did. Under those circumstances, it would be very hard for him to challenge the knowledgability of his guilty plea. On appeal, the petitioner raises the single and very general contention:

> On the facts of this case, did Appellant sufficiently establish such newly-discovered evidence as to justify granting him a new trial?

There is no challenge to the guilty plea in that.

## A Case of Undifferentiated Angst

The hardest thing to do in countering the random charges brought by Yonga is to figure out exactly what those charges are. The opening lines of Tolstoy's Anna Karenina tell us, "Happy families are all alike. Unhappy families are unhappy each in a different way." Thus it would also seem to be with unhappy criminal defendants. Yonga himself is unhappy in different ways. He focuses on one exculpatory fact that he claims is newly discovered. He never, however, locates that fact within any precise framework of legal analysis.

At times, it seems as though Yonga would like to claim that his guilty plea was not voluntarily and knowingly made. In neither his petition for a Writ of Actual Innocence nor at his hearing before Judge Bailey, however, did Yonga even allude to such a challenge. At times his lawyer tells us (Yonga himself has never told us anything) that his earlier lawyer affirmatively lied to him as to why he should enter a guilty plea. Is a Sixth Amendment

claim of ineffective assistance of counsel thereby in the offing? If so, such a challenge has never materialized. Or is Yonga questioning the legal sufficiency of the evidence before some phantom jury at a phantom trial, or just suggesting that, with the benefit of the newly discovered evidence, the phantom jury would not do today what it did (or actually did not do) then? Yonga is unhappy, but he cannot tell us precisely why he is unhappy. All we can do in response is to point out some of the ways in which the State is not unhappy.

**This Petition Is Moot**

As we begin to focus in on the many flaws in the petition for a Writ of Actual Innocence that is before us, the first and foremost is that it is moot. In any post conviction review, even including direct appeal, it is indispensable that the alleged error work some prejudice on the petitioner even to be cognizable. Otherwise, the alleged error would not make any difference. Yonga has, of course, long since finished his six months in jail. He has never been on probation. He is under no order of restitution, and he has paid no fine. In short, he is suffering no direct consequence from his June 4, 2007 conviction upon his plea of guilty. It is, of course, Yonga's burden to show us the prejudice that he is now suffering.

We have gone over, line by line, his petition for a Writ of Actual Innocence of May 10, 2013 and find no remote mention of any prejudice of any sort. At the hearing before Judge Bailey on December 12, 2013, Yonga's counsel said, in passing, "The Court will hear this in testimony. Yonga is a native of the country of Sierra Leone in Africa, and this is causing him significant immigration issues." Actually, the court never did hear that "in testimony," for Yonga never took the stand. No evidence was ever produced about Sierra

Leone or about Yonga personally or about any contact whatsoever with immigration authorities in the six and one-half years since his sentencing. At the outset of the hearing before Judge Bailey, counsel for Yonga did state:

> [DEFENSE COUNSEL]: Mr. Yonga ... is a native of the country of Sierra Leone in Africa, and this is causing him significant immigration issues. I did not believe at this time that a petition for Writ of Error Coram Nobis was the appropriate filing for procedural reasons, so we filed this writ instead.

As the hearing then proceeded, no further mention was made of this situation. Nothing was ever put in evidence. No testimony was heard from Yonga or from anyone else bearing on the risk of deportation. As to what if any contact Yonga had had with immigration officials during the intervening six and one-half years, the court was never told. Was the carefully crafted but unusual sentence of 364 days, instead of a neatly rounded-off one year, arranged as a result of the plea negotiation so that the sentence was one of "less than a year" a factor in any of this? This may have solved any problem that may have existed. The only person who could have enlightened the court as to what, if any, prejudice he was suffering, however, was Yonga himself, and he chose not to do so. The burden to establish some showing of prejudice was on Yonga, and he certainly did nothing in that regard.

### A Collateral Consequence of Possible Deportation

Even if, arguendo, we assume that the Writ of Actual Innocence could apply to a guilty plea, and even if, arguendo, we assume that the mere possibility of deportation is the collateral consequence that breathes life, at least for the moment, into this petition for a Writ of Actual Innocence, how might a deportation scenario play out on this particular stage?

The risk of deportation has certainly been a hot-button legal issue, at least since the Supreme Court decisions of Padilla v. Kentucky, 559 U.S. 356, 130, S. Ct. 1473, 176 L. Ed. 2d 284 (2010), and Chaidez v. United States, 568 U.S. ____, 133 S. Ct. 1103, 185 L. Ed. 2d 149 (2013). See State v. Denisyuk, 191 Md. App. 408, 991 A.2d 1275 (2010); Denisyuk v. State, 422 Md. 462, 30 A.3d 914 (2011); Miller v. State, 196 Md. App. 658, 11 A.3d 340 (2010); Miller v. State, 207 Md. App. 453, 53 A.3d 385 (2012); Miller v. State, 435 Md. 174, 77 A.3d 1030 (2013). In each and every instance, however, the battle was over the knowing character of a guilty plea as the guilty plea itself was under collateral attack by a Writ of Error Coram Nobis.

In every case, the defendant who had entered a plea of guilty had not been informed, by his attorney or by the trial judge, of the possible deportation consequences of a criminal conviction. Where it was the attorney who failed to give the deportation advice, moreover, the attorney was deemed to have rendered ineffective assistance of counsel under the two-pronged Sixth Amendment test of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In such a case, the guilty plea, because of non-advice or bad advice, was considered not to have been a knowing plea and it was, therefore, vacated.

Yonga's guilty plea in this case, by contrast, did not share any risk of being unknowing. As Judge Levitz interrogated Yonga on April 26, 2007, about his understanding of a guilty plea, he expressly alerted Yonga to a possible immigration problem.

THE COURT: As I understand it, you are a citizen of Sierra Leone?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You understand that <u>this guilty plea could have Immigration consequences</u> and <u>if you are concerned about that then I urge you to talk to an Immigration lawyer</u> because I can't advise you about that. I have nothing to do with that. Do you understand that?

THE DEFENDANT: Yes, sir.

(Emphasis supplied).

Yonga, in fact, was already alert to the problem. As part of the plea agreement, the State had agreed to file an amended Criminal Information with a second count, the third-degree sexual offense, that presumably would satisfy the immigration authorities. As the Assistant State's Attorney explained to the court:

MS. COFFIN: At the request of Mr. Fatemi <u>he wanted to have a document that could be presented for Immigration purposes</u>, so I called upstairs and requested a supplemental [Criminal Information], I just handed that to your clerk. <u>The supplemental [Criminal Information] has a second count, which is the third-degree sex offense</u>, so <u>he'll have that for his immigration</u> – .

(Emphasis supplied).

As the Assistant State's Attorney also explained to Judge Bailey at the hearing on December 12, 2013:

MS. COFFIN: A plea was negotiated with the idea of helping him navigate this issue as to whether or not he will be deported.

Quite aside from Yonga's failure to present any evidence of an immigration problem, it fully appears to be the case that there is no immigration problem. There is, therefore, no

prejudice that Yonga is now suffering from his conviction, and the case is moot. <u>Non curat</u> <u>de minimus lex.</u>

## Was the Guilty Plea Otherwise Flawed?

In another respect, however, Yonga, at least through his lawyer's arguments, complains about his lawyer's advice at the time he entered the guilty plea with respect to something other than deportation. Yonga's attorney argues in his brief (although there is no evidentiary support for it) that just prior to Yonga's offering of the guilty plea, his lawyer advised him 1) that the 13-year-old victim and her mother were in the courthouse ready to testify and 2) that Yonga would likely be convicted of the more serious rape charges if he did not accept the proposed plea agreement.

The second piece of advice was in all likelihood true. If actually given, it would appear to have been good advice, not bad advice. In any event, it was a tactical assessment of the State's likely case and was not in any sense unsound.

The first advisement, on the other hand, was about a fact that was meaningless. If the trial was going to go forward, the two key State's witnesses would of course be in the courthouse. The State would by no means attempt to go forward without them. If the trial were not going to go forward, on the other hand, there would be no reason for them to have been brought to the courthouse. The whole issue is inane. What Yonga is now attempting to confabulate, however, is that his lawyer lied to him, that the mother and daughter were in fact not in the courthouse, and that it was this false representation that caused him to plead guilty. Why that fact should have made him plead guilty is not remotely suggested.

Once again, moreover, this is an implied attack on the guilty plea although no formal challenge to the guilty plea has ever been raised.

Even at an additional level of assuming, arguendo, that the validity of the guilty plea was somehow before us (it is not), this ineffectual attack on the plea, quite aside from its total lack of any logical heft, would face an insurmountable procedural hurdle. When a petitioner complains about erroneous advice concerning a guilty plea, it is required that the defendant testify that but for the  bad advice, he would never have entered the plea. Such a cause-and-effect sequence is a sine qua non. In Hill v. Lockhart, 474 U.S. 52, 60, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), the Supreme Court was emphatic:

> [W]e conclude that petitioner's allegations are insufficient to satisfy the Strickland v. Washington requirement of "prejudice." Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial.

(Emphasis supplied).

In Denisyuk v. State, 422 Md. 462, 485-86, 30 A.3d 914 (2011), Judge (now Chief Judge) Barbera wrote to the same effect:

> The Supreme Court found no prejudice for purposes of Strickland, because the defendant "did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial." Hill,  474 U.S. at 60, 106 S. Ct. 366.
>
> Unlike in Hill, Petitioner expressly alleged that he would not have entered the guilty plea had be been advised of the deportation risk of doing so.

(Emphasis supplied).

In <u>Miller v. State</u>, 196 Md. App. 658, 681, 11 A.3d 340 (2010), this Court made emphatically clear that if a defendant claims that misinformation or bad advice had induced him to enter a guilty plea, it is absolutely essential that he should testify that if he had had correct information, he would not have entered the plea.

> On the merits, the ultimate issue would be the voluntariness of the 1999 guilty plea. At the coram nobis hearing at which this contention was raised, the appellant was the only witness to take the stand. <u>At no time did he come remotely close to testifying that if he had known that he had only a right to apply for leave to appeal rather than an unfettered right to appeal, he would never have entered the guilty plea.</u> Even if such a notion might seem outlandish, <u>the appellant could have raised it, but did not.</u> His, of course, was the burden of proof and <u>he never suggested what prejudice he suffered as a result of his imperfect knowledge. Without some prejudice, there is no reversible error.</u>

(Emphasis supplied).

> Yet, Yonga's current lawyer tells us in his brief:

> With respect to Appellant's original trial lawyer, <u>if that attorney had not misled Mr. Yonga</u>, by telling Appellant that the [mother and daughter] were in the Courthouse and ready to testify against him on the scheduled date of trial, <u>Appellant would have insisted on a trial</u>.

(Emphasis supplied).

Only Yonga, of course, could tell us that and Yonga never did. Even if the attack on the knowledgability of the guilty plea were allowed, it would fail. Yonga has obviously become aware of this requirement for he filed an affidavit on August 25, 2014, in which he avers:

> On that date [April 6, 2007], Mr. Fatemi told me that [the victim] and her mother ... were in the Courthouse, ready to testify against me, and that I would likely be convicted of a far more serious crime if I did not agree to

plead guilty to a third degree sexual offense involving [the victim] under a plea bargain. <u>Consequently, I agreed to plead to the third degree sexual offense charge.</u>

(Emphasis supplied).

A fatal problem with this affidavit of August 25, 2014, the first intimation of any catalytic impetus for Yonga's guilty plea, is that it came nine months after the hearing before Judge Bailey on December 12, 2013 had concluded. "The moving finger writes and, having writ, moves on." This is a classic case of locking the barn door after the horse is out. When Judge Bailey's decision was made, the affidavit did not exist. We do not hesitate to hold that Judge Bailey was not in error for having failed to be a prophetess.

## A Recantation Without a Cantation

With the passing of the years, perspectives on the events of November 3, 2006 appear to have mellowed perceptibly. At some time in 2012, approximately five years after the criminal incident, the victim and Yonga reestablished a friendly relationship, on Facebook and via e-mail and through a chat room. The victim claimed on Facebook to have been totally ignorant of the fact that Yonga had been prosecuted. In her testimony at the hearing before Judge Bailey on December 12, 2013, she described her surprise at learning about Yonga's prosecution.

> [THE VICTIM]:  I told him, 'I don't know how because I never went forward with going to court, none of that. I had told the police that nothing happened, and from my understanding that was the end of it.'

As a direct result of that conversation, the victim went with Yonga to the office of Yonga's defense counsel in Baltimore County and offered to testify on Yonga's behalf. In

her testimony on December 12, 2013, she swore that there had never been any sexual contact between her and Yonga. She described their first meeting.

> [DEFENSE COUNSEL]: Did there come a time where you two met face-to face?
>
> [THE VICTIM]: Yes.
>
> Q. Tell the judge what the circumstances of that was.
>
> A. The day me and Sam met was – <u>when we first met we just talked. We were just talking, and then my mother came in</u>, she was out with my aunt.
>
> Q. Where did this take place?
>
> A. At my house...She was out with my aunt, and <u>she came in and saw Sam on the couch and she just went off</u>. She thought something was happening. <u>I tried to explain to her that nothing was happening</u>, and at that time Sam had ran out of the house because he was scared. So she called the police and the police – .

(Emphasis supplied).

The problem of referring to that as recantation is that at the hearing Yonga never established what earlier statement was being recanted. The victim had never on any earlier occasion given any testimony under oath. She had never given a deposition and had never made an affidavit. There was no signed or videotaped statement given to the police. Even in terms of more informal police interviews, Yonga offered nothing before Judge Bailey with respect to which her exculpatory testimony of December 12, 2013 was a recantation.

There cannot be a recantation until there is something to recant.[5] The burden of proof was on Yonga, and Yonga did not carry that burden.

Indeed, the victim's testimony at the hearing seemed to have been consistent with full 90% of what she claimed her earlier statements had essentially been. She testified that she told her mother that nothing had happened and she then told the police that nothing had happened.

> [THE VICTIM]:  My mother called the police. When they came, they asked me what happened –
>
> [DEFENSE COUNSEL]:  Okay, let me stop you there. You were interviewed by police officers at your house?
>
> A. Yes.
>
> Q. How long did that interview last?
>
> A. 10 or 15 minutes.
>
> Q. <u>Do you remember what you told them</u>?
>
> A. <u>I told them the exact same thing I told my mother</u>. <u>Nothing happened, we were just talking</u>. <u>My mother came and assumed that something was happening</u>.

(Emphasis supplied).

The victim states that her only contact with anyone from the State's Attorney's Office or the Police Department was on the day of the incident.

---

[5]In a straight line from the Inquisition and the <u>auto-da-fé</u>, the concept of 'recantation' carries some heavy baggage and, as <u>Jackson v. State,</u> 164 Md. App. 679, 691-92, 884 A.2d 694 (2005), reminds us, we should try to be modest in using it.

[DEFENSE COUNSEL]: Okay. So that day of the incident was the only contact you've had with anyone in the Police Department?

[THE VICTIM]: Yes.

Q.  <u>After that day did you know if the case was being prosecuted against Mr. Yonga</u>?

A.  <u>No, from my understanding everything was dropped</u>.

(Emphasis supplied). The victim was firm that she had no further contact with any authorities.

[DEFENSE COUNSEL]: After that day and after that interview, did you ever have any contact with anyone from the State's Attorney's Office? That is the prosecutor's office in Baltimore County. Were you ever interviewed by a prosecutor?

[THE VICTIM]: No.

Q.  You sure of that?

A.  Yes.

Q. Okay. Did you ever have any subsequent follow-up conversations with anyone in the police department?

A.  No.

Q.  Did you ever give any kind ever (sic) written statement?

A.  No.

Q.  Did you ever give any kind of statement that to your knowledge was recorded in any way?

A.  No.

Q. Okay. Now, did you know at that time – and when I say, 'at that time,' the time frame I'm talking about is the year of 2007. <u>Did you know the case was going forward for prosecution</u>?

A. <u>No</u>.

(Emphasis supplied).

Although the victim consistently maintained to her mother and to the police generally that there had been no sexual contact between her and Yonga, she testified that she did give one false and inculpatory statement when some unidentified male policeman threatened to send her to jail if she did not make such an accusatory statement.

[THE VICTIM]: ... I <u>kept telling them nothing happened</u>, my mother came and assumed. <u>At that time a man came in, and he was just telling me that if I didn't go along with the story that I would be the one that was going to jail for a false statement that was not given. So, I felt as though if I didn't go along with the story, my mother would be mad at me and I would end up in jail</u>.

[DEFENSE COUNSEL]: Okay. So, did there come a time then during that interview when <u>you told them that there was sexual intercourse</u>?

A. <u>Yes</u>.

Q. Was that the truth?

A. No.

(Emphasis supplied).

The lead investigator on the case had been Policewoman Jessica Hummel of the Baltimore County Sex Offense Unit. Who the mysterious and threatening male police officer was, Judge Bailey was never told. With respect to what officers were present when any inculpatory statement may have been given by the victim, Yonga offered the court nothing.

It was his burden to establish a basis for a supposed recantation and he failed to do so. Judge Bailey was asked to believe in the intercession of a phantom stranger. She was not persuaded to do so.

On cross-examination, the victim insisted that she consistently denied that there had been any sexual contact:

> [THE VICTIM]: I just told everybody the same thing. My mother, I told her nothing happened. I told the police nothing happened. That's the truth. Nothing ever happened.

We infer from the incredulous tone of the State's cross-examination that some of the victim's answers may have been less than models of rectitude. The State's disinclination to mount a rebuttal may have been based on its sense that it was holding a pat hand and that a more strenuous response was unnecessary. The words of this Court in Carr v. State, 39 Md. App. 478, 484, 387 A.2d 302 (1978), rev'd on other grounds, 284 Md. 455, 397 A.2d 606 (1979), seem highly pertinent:

> We note, as did the trial judge, that post-trial recantation of witnesses are looked on with the utmost suspicion.

See also Jackson v. State, 164 Md. App. at 695.

## Like Daughter, Like Mother

If the years mellowed the victim's perception of 2006, time also sedated her mother. Yonga does not market the mother's current testimony as a "recantation," but she was, other than her daughter, the only witness presented as a source of the newly discovered evidence

- 46 -

of actual innocence.  At the hearing before Judge Bailey, the mother testified to her present

recollection of what happened on November 3, 2006:

> A.  When I came in it was me and my twin sister.  When I came in the door <u>they were sitting in the living room.</u> [My daughter] ain't suppose to have no company.  <u>They were sitting in the room chitchatting or whatever.  Sam ran out the house</u> and I was like, "[The victim], you know you ain't suppose to have no company."

> I jumped to – I assumed that they were having sex.  <u>I didn't ask no questions or none of that.</u>  I just assumed that they were having sex because she was so young and, you know, I ain't never meet him, so I assumed that they were just having sex.  <u>I didn't ask no questions or nothing.</u>

> Q.  <u>The police report indicates that Mr. Yonga was partially clothed and that he had had a condom on</u>, did you see any evidence of that?

> A.  <u>No, none of that.</u>

> Q.  You're clear you saw them in the living room on the couch?

> A.  <u>It was in the living room, and they were fully dressed.</u>

(Emphasis supplied).

According to the mother, she never told the police anything other than this.  She

professed to having had no idea that a prosecution ever occurred:

> Q.  Did you have an understanding or <u>did you know if the case had ever been prosecuted against Mr. Yonga?</u>

> A.  <u>I thought they just let it drop.</u>  I didn't hear nothing from nobody.  Nobody ain't called, nobody ain't send no mail, no nothing, so we thought the case was just dropped.

(Emphasis supplied).

When, years later, she learned that Yonga had been prosecuted, her reaction was almost saintly:

> Q. When you found out later through Facebook contact with Mr. Yonga that the case was prosecuted, what did you and your daughter decide to do?
>
> A. I told her I had to make this right, because he is a good person and he don't deserve none of this. Like I said, I jumped to conclusions that they were doing something they ain't had no business doing. So, yeah, I told him I had to make this right.
>
> Not with just him, but with myself, because I had to move on with my life. I don't want somebody doing some time if they didn't do nothing. I been there, and I don't want nobody else to go through that.

(Emphasis supplied).

As Judge Bailey observed in her final analysis, "It just defies comprehension."

## Weighing the Evanescent Evidence of Innocence

Judge Bailey's comment was not inappropriate, for it was her job to judge for herself the credibility of the witnesses and then to weigh the impact of their testimony. Their assertions are by no means to be accepted as presumptively true. In Jackson v. State, 164 Md. App. at 694, this Court described the trial judge's indispensable function in this regard:

> In the context of a Motion for a New Trial based on newly discovered evidence, there is a threshold question of the trustworthiness of the newly discovered evidence and of the credibility of its source. It is clear that the judge called upon to decide the motion may assess trustworthiness and credibility for himself, even though the verdict in the case was rendered by a jury.

(Emphasis supplied).

- 48 -

The Court of Appeals in Campbell v. State, 373 Md. 637, 666-667, 821 A.2d 1 (2003), confirmed the fact finding function of the trial judge:

> In order for the newly discovered evidence to warrant a new trial, the trial judge must find it to be both material and persuasive such that "[t]he newly discovered evidence may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected."

(Emphasis supplied). See also, Argyou v. State, 349 Md. 587, 600, 709 A.2d 1194 (1998) ("The trial courts also have authority to weigh the evidence and to consider credibility of witnesses when the motion is grounded on newly discovered evidence.") (Emphasis supplied); Jones v. State, 16 Md.App. 472, 479, 298 A.2d 483 (1973).

As ostensible evidence of actual innocence, the testimony of the victim and of the victim's mother must be viewed in the larger totality of everything that was before Judge Bailey. Significantly included in that totality was the sentencing hearing of Yonga before Judge Levitz on June 4, 2007. On the issue of actual innocence, it would be hard to ignore the conclusion in that regard expressed by Yonga's father:

> "Your Honor, my son made a mistake for which we're very, very remorseful. We just ask for leniency."

(Emphasis supplied).

The father's feeling about his son's behavior was shared by Yonga's mother:

> "My son made a mistake, sir. He will not do it again. I work with children. I am a nurse."

(Emphasis supplied).

The mother of Yonga's child shared the family's feelings:

- 49 -

"<u>He made</u> a great, you know, <u>a great mistake.</u>"

(Emphasis supplied).

Yonga's lawyer was of a like mind:

"<u>Mr. Yonga made a mistake.</u>   ... <u>He has learned his lesson.  He has great remorse.  He ha[s] expressed his remorse regarding this matter to his family members.</u>"

(Emphasis supplied).

Yonga himself expressed his sorrow for what he had done.

"<u>I'm very sorry.</u>  Really, really, really sorry.  <u>I made a mistake and I've learned a lot from it.</u>  ... I'm so deeply, really sorry.  <u>It bothers me every day</u> but <u>it's a mistake I made.</u>  I'm going through it, you know, I'm very, very, very sorry."

(Emphasis supplied).

This is simply not the language of actual innocence.  Yonga and his family apparently did not believe that he was innocent and their knowledge of the crime was not dependent on the vacillating perceptions of the victim or the victim's mother.  Maybe they were all simply faking remorse  before Judge Levitz, but that is a far harder inference to draw than that they were expressing their true feelings about what Yonga had done.

On the issue of actual innocence, moreover, it is overwhelmingly significant that Yonga himself never claimed to have been innocent. He filed no affidavit to that effect.  For whatever reason, he never took the stand before Judge Bailey but chose to sit silent.  Significantly, this was not a trial where the State has to prove guilt.  Yonga enjoyed no presumption in that regard.  It was a hearing whereat he had to prove his innocence.  That is a hard thing to do when you do not speak.

## The Significance of Disbelief

Yonga's entire case of actual innocence consisted of his two witnesses: 1) the original

victim and 2) her mother. How to assess their credibility and how to weigh their testimony

was in the unfettered domain of Judge Bailey. Her verdict in that regard was clear:

> There are simply too many inconsistencies. The transcript indicates that that
> young lady was given a Depo-Provera shot at the clinic that she was taken to,
> there are too many details. It just defies comprehension.
>
> While I do sympathize with the immigration issues and while I do understand
> what is patently obvious that [the victim] and the [mother] are attempting to
> do, most respectfully I don't believe a word that they said today. ... They're
> trying to help Mr. Yonga, quite honestly, and that's very patently clear. ...
> [T]he writ is denied.

(Emphasis supplied).

With the words "I don't believe a word that they said today," Yonga's entire case went

up in a puff of smoke. Before Judge Bailey, of course, Yonga may have had two witnesses.

Before us on appellate review, by contrast, Yonga has nothing. We do not assess his

witnesses' credibility nor weigh the evidence de novo. Judge Bailey was the fact-finding

judge and we accept her fact-finding as historic reality unless it was clearly erroneous. It was

not. Before us, therefore, it is as if those two witnesses had never been called or as if their

testimony did not exist. In the face of this stark reality – the absolute absence of any

evidence – how can Yonga's argument even be considered?

## What Does it Take To Be Unpersuaded?

The only question might be, "Can a judge utterly disbelieve a witness without being clearly erroneous?" Of course, she can. In response to Judge Bailey's conclusion that she did not believe a word said by either of Yonga's witnesses, counsel can but feebly counter that Judge Bailey was clearly erroneous. That raises the fascinating question. Can a fact-finding judge who is unpersuaded by even uncontradicted testimony offered by the proponent of a proposition who bears the burden of proof ever be clearly erroneous? Although the cautious response may be, "Never say 'never,'" it is hard to imagine an exception to the "never."

It is easy to conjure up scenarios, of course, wherein a fact finder may be clearly erroneous when he or she is actually persuaded of something. It is a far, far different phenomenon when one is simply unpersuaded. To be unpersuaded, there is no burden of production that has to be satisfied. To be unpersuaded, there is no level of persuasion that has to be applied. This Court explained the chasm of difference between being persuaded and being unpersuaded in <u>Starke v. Starke</u>, 134 Md. App. 663, 680-81, 761 A.2d 355 (2000):

> [I]t is far easier to sustain as not clearly erroneous the decisional phenomenon of not being persuaded than it is to sustain the very different decisional phenomenon of being persuaded. Actually to be persuaded of something requires a requisite degree of certainty on the part of the fact finder (the use of a particular burden of persuasion) based on legally adequate evidentiary support (the satisfaction of a particular burden of production by the proponent). There are with reasonable frequency reversible errors in those regards. <u>Mere non-persuasion, on the other hand, requires nothing but a state</u>

> of honest doubt. It is virtually, albeit perhaps not totally, impossible to find
> reversible error in that regard.

See also Pollard's Towing, Inc. v. Berman's Body Frame & Mechanical, Inc., 137 Md. App. 277, 289-90, 768 A.2d 131 (2001) ("Far less is required to support a merely negative instance of non-persuasion than is required to support an affirmative instance of actually being persuaded of something."); Angelini v. Harford County, 144 Md. App. 369, 376, 798 A.2d 26 (2002) ("In arguing more broadly that she thereby satisfied her 'burden of proof,' the appellant disingenuously blurs the critical and rudimentary distraction between a burden of production and a burden of persuasion. ... To have produced enough of a case to permit the Board to extend the B-3 zoning boundary was not the end of the appellant's persuasion process, but only its beginning. Until the burden of production is a successful fait accompli, an effort at persuasion does not even begin."); Bricker v. Warch, 152 Md. App. 119, 138, 831 A.2d 453 (2003) ("On this issue the appellees enjoyed the luxury of not having to prove anything. They could simply sit back and rest content as the appellant failed to carry his burden of persuasion.").

Judge Bailey was not persuaded. Judge Bailey was not clearly erroneous.

## Can Non-Evidence Ever Be Newly Discovered?

When Judge Bailey announced that she did not believe a word of the testimony of either the victim or her mother, that testimony, for purposes of appellate review, ceased to exist. If such evidence is, indeed, non-existent, what difference can it possibly make whether it is or is not newly discovered? None, of course.

In the interest of analytic completeness, however, we will engage in one final assumption. If, <u>arguendo</u>, the testimony of the victim and her mother had been believed, would such evidence have qualified as having been newly discovered?

Yonga argues in his brief that "a recantation is by definition newly discovered evidence." He is much too narrow, however, in his understanding of the "newly discovered evidence" that both Rule 4-331(c) and Rule 4-332 are talking about. <u>Love v. State</u>, 95 Md. App. 420, 429, 621 A.2d 910 (1993), reminded us of the fuller meaning:

> Let it be carefully noted that the exclusive predicate for new trial relief under subsection (c) is not merely "newly discovered evidence." <u>It is, rather, "newly discovered evidence which could not have been discovered by due diligence."</u> Even if, for stylistic reasons, we occasionally resort to the convenient shorthand form of "newly discovered evidence," <u>it is nonetheless implicit that an indispensable part of the definitional</u> predicate for this form of relief is <u>the further and invariable proviso: "which could not have been discovered by due diligence."</u>

(Emphasis supplied).

According to the victim's current testimony, it is not only now – at present – that she is insisting that nothing sexual happened between her and Yonga on November 3, 2006, but that has always, with one brief lapse, been her position. If Yonga and/or his lawyer, as a part of routine trial preparation, had interviewed the victim prior to the scheduled trial date in the spring of 2007, or demanded copies of any statement she had made or asked for a bill of particulars, Yonga would not have had to guess about what his chat room friend would probably say about November 3, 2006.

The same is true about the testimony of the mother. Neither Yonga nor his lawyer ever made the most rudimentary effort to discover what either of these witnesses would actually have to say about the crime to which he pled guilty. Their apparent indifference was the diametric opposite of diligence.

If, on the other hand, the present positions of the victim and her mother are, indeed, the result of a change in their attitude, we have no idea when such a change might have taken place. It makes no sense that the change, if there actually was such a change, only occurred in the course of a Facebook conversation in 2012. All indicators are that the mellowing or softening of attitude had occurred years before that. If Yonga had made any effort to discover the post-2006 attitude of the two witnesses, it was, as an abstract reality, discoverable. He, however, made no effort to discover it. He made not the slightest effort to discover the new evidence. He simply waited until the new evidence, by random chance, discovered him. That is hardly due diligence.

Yonga, of course, blithely protests that he did not look for a change in their position because he had no reason to expect a change. A reason for his lack of diligence, however, is not the same thing as diligence itself. <u>Love v. State</u>, 95 Md. App. at 436, is instructive in this regard.

> The appellant makes several efforts to wriggle out from under the foreclosing effect of not having interviewed Clarissa Hubbert and then calling her as a defense witness. He states that the Assistant Public Defender handling his case determined, as "the best trial tactic," to demur to the facts and to make three procedural arguments. The wriggle is unavailing. <u>Even a good explanation for not having exercised due diligence is not the same thing as the actual exercise of that due diligence. It is the latter that is required, not</u>

the former.  The modifying clause "which could not have been discovered by due diligence..." is an in rem characterization of the evidence itself, not an in personam comment upon the lawyerly performance.

(Emphasis supplied).

The evidence itself was capable of being discovered if Yonga had made a diligent effort to discover it.  See also Jackson v. State, 164 Md. App. at 690:

> The test, of course, is whether the evidence was, in fact, discoverable and not whether the appellant or appellant's counsel was at fault for not discovering it.

(Emphasis supplied).

The concern is not that the evidence in question **was not** earlier discovered. Nor are we concerned with **why** the evidence **was not** earlier discovered. Our only concern is with the fact that, with diligence, the evidence **could have been** earlier discovered. The diligence criterion is a demanding one, and it may not be casually brushed aside.

## Conclusion

Yonga's petition for a Writ of Actual Innocence was properly denied. Even assuming the applicability of the Writ of Actual Innocence to a guilty plea, Yonga in almost every way failed to make a case for the issuance of the writ. All of that, however, is secondary.

First and foremost is our primary holding that the Writ of Actual Innocence does not apply to a guilty plea.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**